

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

ATLANTIC OUTDOOR ADVERTISING, INC.,
SCENIC OUTDOOR, INC., TROYSTAR CITY
OUTDOOR LLC, and WILLOW MEDIA, LLC.

               Plaintiffs,

    – against –

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER,

               Defendants.

--------------------------------------------------------------------x

**COMPLAINT AND JURY DEMANDERS**

Plaintiffs Atlantic Outdoor Advertising, Inc., Scenic Outdoor, Inc., Troystar City

Outdoor LLC, and Willow Media, LLC, by and through their attorneys, Emery Celli Brinckerhoff

& Abady LLP, for their Complaint allege as follows:

## NATURE OF THE CASE

1.     This is an action to preliminarily and permanently enjoin New York City's

unconstitutional scheme for regulating advertising signs on billboards located along arterial

highways.

2.     The New York City Zoning Resolution generally prohibits all advertising

signs located within 200 feet of arterial highways and severely restricts the size of advertising

signs located within 900 feet of arterial highways. The City's purported justification for this

substantial restriction on protected commercial speech is its desire to promote "traffic safety and

aesthetics." However, there is no credible evidence suggesting, much less demonstrating, that

highway billboards have any adverse impact at all on traffic safety, and the City has never bothered to perform any studies of its own seeking to establish such a connection. Nor can the City credibly claim that highway billboards have any adverse impact on aesthetics because they are located exclusively in commercial and manufacturing zoning districts, not in residential districts, and because the City has never bothered to engage in any comprehensive or coordinated effort to analyze, much less improve, the attractiveness of the City's commercial and manufacturing urban landscape.

3.      Even assuming that the City had a legitimate interest in promoting traffic safety and aesthetics, the City's regulation of highway billboards has more holes than Swiss cheese, demonstrating plainly that its asserted interest is nothing but a pretext for the City's true purpose for its regulation: to eliminate competition and make money for *itself*.

4.      In 2004, the City announced its plan to auction off its "Coordinated Street Furniture Franchise" to the highest bidder. The winning franchisee will be entitled to place advertising signs on literally *thousands* of bus shelters, newsstands, and telephone booths located across the City. These advertising signs will be far more dangerous and unsightly than Plaintiffs' highway billboards allegedly are – both because of the sheer breadth of the City's street furniture program, and because the street furniture advertising signs will be located in residential areas and on uncontrolled access city streets that, because they contain traffic signals, stop signs, parked cars, cyclists, and pedestrians, are far more dangerous than controlled access highways such as the Long Island Expressway or the Cross-Bronx Expressway.

5.      Naturally, the City is willing to overlook its purported concern for safety and aesthetics when it comes to its street furniture franchise, for the City stands to enjoy the

-2-

benefit of *over one billion dollars* in revenue that the franchisee has guaranteed the City over the next twenty years. Indeed, the City has expressly acknowledged that the street furniture franchise will become even more valuable, and will generate even more revenue for the City, if restrictions on highway billboards are tightened. It is therefore plain that the City's primary motivation in regulating outdoor advertising is to stifle competition, not to promote safety or aesthetics, and it is axiomatic that the government may not purposefully and substantially restrict protected speech in order to make a buck.

      6.     New York City's scheme for regulating arterial highway billboard advertising is not just cynical. It is irrational. For example, there are *scores* of government-controlled advertising signs on billboards located along arterial highways in New York City that are entirely exempt from regulation under the Zoning Resolution. These highway advertising signs – which are operated by government entities such as the Metropolitan Transportation Authority ("MTA"), the Port Authority of New York and New Jersey ("Port Authority"), and most notably *the City itself*, and which generate substantial revenue by advertising commercial products – are the equivalent of Plaintiffs' billboards, and yet they are permitted.

      7.     Similarly, New York City has grandfathered approximately 150 advertising signs on highway billboards simply because they existed in or before 1979, regardless of the fact that virtually all of these signs fail to comply with the highway distance requirements of the Zoning Resolution. These grandfathered signs are also equivalent to Plaintiffs' billboard signs, and yet they are permitted.

      8.     Such blatant and irrational underinclusiveness is not tolerated by the First Amendment because it demonstrates that the government's asserted interest in restricting speech

is not sincere, and that the government has burdened more speech than is necessary in order to attempt to achieve its purported goal.

9.      For all of these reasons, the City's scheme for regulating highway billboard advertising signs is unconstitutional and must be enjoined.

## THE PARTIES

10.     Plaintiff Atlantic Outdoor Advertising, Inc. ("Atlantic") is a New York corporation located at 65 Central Park West, New York, New York.  Atlantic is engaged in the business of outdoor advertising and operates various billboards located along arterial highways in New York City.

11.     Plaintiff Scenic Outdoor, Inc. ("Scenic") is a New York corporation located at 140 Sagaponack Road in Bridgehampton, New York.  Scenic is engaged in the business of outdoor advertising and operates various billboards located along arterial highways in New York City.

12.     Plaintiff Troystar City Outdoor LLC ("Troystar") is a New York limited liability company located at 1333 Broadway, New York, New York   Troystar is engaged in the business of outdoor advertising and operates various billboards located along arterial highways in New York City.

13.     Plaintiff Willow Media, LLC ("Willow") is a New York limited liability company located at 1 Columbus Place, New York, New York.  Willow is engaged in the business of outdoor advertising and operates various billboards located along arterial highways in New York City.

-4-

14.    Defendant City of New York ("the City"or "New York City" ) is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment and enforcement of outdoor advertising regulations within New York City.

15.    Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings ("DOB"). Commissioner Lancaster is sued herein in her official capacity.

16.    Defendant Edward Fortier is the Director of the Padlock/Sign Enforcement Unit of the New York City Department of Buildings. Mr. Fortier is sued herein in his official capacity.

## JURISDICTION AND VENUE

17.    This action arises under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the United States Constitution.

18.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343.

19.    The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

20.    Plaintiffs demand trial by jury in this action.

## FACTUAL ALLEGATIONS

### A.     The City's Regulation of Arterial Highway Billboards

21.    The New York City Zoning resolution defines a "sign" to include any writing, pictorial representation, emblem, or flag that is attached to, painted on, or in any other manner represented on a building or other structure, and that is used to announce, direct attention to, or advertise, and that is visible from outside of a building. Z.R. § 12-10 (definition of "sign").

22.    The Zoning resolution distinguishes among three types of "signs": "advertising" signs, "accessory use signs," and "non-commercial" signs.

23.    An "advertising sign" is a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered *elsewhere than upon* the premises where the sign is located. Z.R. § 12-10 (definition of "advertising sign"). A sign is, by definition, not an "advertising sign" if it is "accessory to a use located on the zoning lot" containing the sign. *Id.*

24.    An "accessory use sign" is a sign that directs attention to a business or profession that is conducted *on the premises* where the sign is located. Z.R. § 12-10 (definition of "accessory use"). Accessory use signs are also referred to as "on-premises signs" or "business signs."

25.    The Zoning Resolution liberally permits accessory use signs and non-commercial signs to be placed and maintained anywhere in commercial and manufacturing districts, subject only to size, height, illumination, and projection limitations. Z.R. §§ 32-62 to 32-661; *id.* §§ 42-52 to 42-543.

26.    Contrary to its treatment of accessory use signs and non-commercial signs,

-6-

the Zoning Resolution places substantial restrictions on where advertising signs may be located in commercial and manufacturing districts. Whereas accessory use signs and non-commercial signs may be located anywhere, advertising signs in commercial or manufacturing districts may not be located within 200 feet of an arterial highway. Z.R. §§ 32-662, 42-55(a). Beyond this 200-foot radius, advertising signs are permitted, but only so long as the square footage of the face of the sign does not exceed the number of linear feet from the sign to the outer boundary of the 200-foot radius. Z.R. §§ 32-662, 42-55(b).

27. So, for example, an advertising sign located 300 feet from an arterial highway may not be larger than 100 square feet (because it is 100 linear feet from the 200-foot radius), and an advertising sign located 700 feet from an arterial highway may not be larger than 500 square feet (because it is 500 linear feet from the 200-foot radius).

28. The limits imposed on the locations of advertising signs near arterial highways extend far beyond what one might conventionally consider to be a "highway" because the Zoning Resolution defines the term "arterial highway" broadly to include no fewer than 72 highways, parkways, toll crossings, boulevards, and streets across the City. Z.R. Appendix C.

29. Although these regulations have been on the books for many years (the basic ban on advertising signs near arterial highways dates back to 1940), until recently the City largely did not enforce them.

30. In 2001, the New York City Council enacted Local Law 14, which, among other things, empowered the New York City Department of Buildings to promulgate administrative rules requiring the operator of any sign located within 200 feet of an arterial

-7-

highway to apply for and obtain a permit for such sign. A.C.N.Y. § 26-253 (2001). However, DOB never promulgated rules implementing Local Law 14.

31.     Local Law 14 also empowered DOB to promulgate administrative regulations requiring all "outdoor advertising companies" – defined broadly to include any person or entity, or any affiliate of any person or entity, engaged in the outdoor advertising business – to register with DOB. A.C.N.Y. §§ 26-259, 260 (2001). Such registration must include a complete inventory of all of the outdoor advertising companies' signs and locations, including a certification by an architect or engineer, co-signed by a responsible officer of the outdoor advertising company, that each sign complies with all aspects of the Zoning Resolution, the Administrative Code, and DOB's administrative rules. A.C.N.Y. § 26-261 (2001). Failure to register or to comply with the Zoning Resolution, Administrative Code, and administrative rules became a misdemeanor, and DOB became empowered to impose fines of up to $15,000 for a first offense and $25,000 for each subsequent offense. A.C.N.Y. § 26-262 (2001). Again, however, DOB never promulgated any rules implementing any of these aspects of Local Law 14.

32.     In 2005, the New York City Council enacted Local Law 31, which somewhat altered the regulatory scheme envisioned by Local Law 14. Local Law 31 empowered DOB to promulgate administrative rules requiring permits for all signs located within 900 feet and in view of an arterial highway and requiring outdoor advertising companies to submit a complete inventory of all such signs. A.C.N.Y. §§ 26-253, 261 (2005).

33.     On July 26, 2006, after years of delays, DOB finally promulgated administrative rules implementing Local Laws 14 and 35. 1 R.C.N.Y. §§ 49-01 *et seq.* ("Rule 49.") The DOB rules, which took effect on August 25, 2006, purport to require outdoor

-8-

advertising companies to register their sign inventories on or before October 24, 2006. *Id.* § 49-11. These registration requirements are almost impossible to satisfy, and pose enormous burdens upon Plaintiffs.

B.  **The City's Scheme For Regulating Arterial Highway Billboards Does Not Directly or Materially Advance Its Purported Interest in Promoting Traffic Safety and Aesthetics**

34.  The City claims that its scheme for regulating billboards on arterial highways is permissible because it has a substantial interest in promoting traffic safety and aesthetics.

35.  No reliable, peer-reviewed, scientific study has ever concluded or demonstrated that there is any connection between highway billboards and traffic safety or that highway billboards compromise traffic safety in any way.

36.  The City has never studied whether there is any connection between highway billboards and traffic safety in New York City or whether highway billboards compromise traffic safety in New York City in any way.

37.  There is, in fact, no connection between highway billboards and traffic safety. Plaintiffs' highway billboards do not affect or compromise traffic safety in any way.

38.  Even if the City were attempting to regulate an interest in promoting traffic safety and aesthetics, the City's scheme for regulating highway billboards does not directly advance that interest.

39.  On information and belief, of the several hundred advertising signs on billboards on arterial highways in New York City, approximately 150 have legal non-conforming

use status (*i.e.*, they are grandfathered), and approximately 85 are government-controlled billboards that purportedly are exempt from the requirements of the Zoning Resolution. Therefore, approximately 235 advertising signs (the grandfathered billboards and the exempt government-controlled billboards) will be permitted to remain in place.

40.     Moreover, *all* of the remaining arterial highway billboards – even those that are subject to but do not conform to the Zoning Resolution in their current form – likewise will be validly registered with DOB and will be permitted to remain in place even if the new DOB regulations are enforced.

41.     This is so because all of the currently non-conforming advertising signs located along arterial highways in New York City may validly be converted to either on-premises (accessory use) signs or non-commercial signs.

42.     All of Plaintiffs' advertising signs have valid on-premises sign permits. It is therefore entirely permissible for these billboard signs to direct attention to businesses conducted on the premises where the signs are located. The only reason that these signs are non-conforming is that their copy has been changed to direct attention to businesses conducted at locations other than on the premises where the signs are located. Accordingly, if Plaintiffs simply change the copy on these currently non-conforming signs to direct attention to an on-premises business – or to non-commercial copy – these signs may validly be registered with DOB and will be permitted to remain in place.

43.     If Defendants are not enjoined and Plaintiffs change the copy so that advertising billboards become on-premises billboards, whatever effect these billboards have on traffic safety and aesthetics will remain exactly the same.

-10-

44.     This again demonstrates the complete irrationality of the legislative scheme, and the hollowness of the justification (promotion of traffic safety and aesthetics) used to justify this regulation of commercial speech.

45.     Plaintiffs will continue to generate revenue if they convert their advertising signs to either on-premises signs or non-commercial signs. There is demand for use of Plaintiffs' billboards among on-premises businesses. There also is demand for use of Plaintiffs' billboards among non-commercial entities such as political, educational, and religious institutions.

46.     Accordingly, if the new DOB regulations are enforced, Plaintiffs will not take down *any* of their currently non-conforming arterial highway signs. Instead, Plaintiffs will simply convert the signs on these billboards to either on-premises signs or non-commercial signs.

47.     Even assuming that arterial highway billboards did affect traffic safety, which they do not, advertising signs certainly do not affect traffic safety any more or less than on-premises signs or non-commercial signs.

48.     Because not a single arterial highway billboard will be removed even if the new DOB regulations are enforced, the City's regulatory scheme does not advance its purported interest in promoting traffic safety *at all*, much less directly or materially.

49.     Nor does the City's regulatory scheme directly or materially advance its purported interest in promoting aesthetics. The City has not conducted any studies concluding or demonstrating that arterial highway billboards – all of which are located in commercial or manufacturing districts, not residential districts – substantially compromise or adversely affect the attractiveness of the urban landscape.

-11-

50.    The City has not engaged in any comprehensive or coordinated effort to study or address aesthetic issues in commercial or manufacturing districts.

51.    Plaintiffs' highway billboards do not affect or compromise the aesthetics of the urban landscape in New York City.

52.    Because not a single arterial highway billboard will be removed even if the new DOB regulations are enforced, the City's regulatory scheme does not advance its purported interest in promoting aesthetics *at all*, much less directly or materially.

53.    Indeed, even if Plaintiffs were compelled to remove the copy from their arterial highway billboards, the billboards structures themselves would still remain where they are. All of Plaintiffs' arterial highway billboards have valid structural permits issued by DOB. Plaintiffs would have no incentive to take down the actual billboard structures themselves, because doing so would be very costly and would not bestow any benefit on Plaintiffs.

54.    Because bare billboard structures without advertising copy are, if anything, *less* attractive than billboards containing sign copy, the City's regulatory scheme does not directly advance its purported interest in promoting aesthetics.

### C.    The City's Regulation of Outdoor Advertising Is Not Narrowly Drawn to Its Purported Interest in Promoting Traffic Safety and Aesthetics

55.    To say that the City's scheme is not narrowly drawn to its purported interest in promoting traffic safety and aesthetics would be a dramatic understatement. Far from regulating outdoor advertising in a consistent and evenhanded manner, the City's scheme (1) permits and encourages street furniture advertising on City streets that is more dangerous than arterial highway billboards allegedly are; and (2) permits exempt government advertising signs

-12-

and grandfathered advertising signs to be located along arterial highways even though such signs
are indistinguishable from Plaintiffs' non-conforming signs in terms of safety and aesthetics.

### 1.   The City's Street Furniture Franchise

56.    Tellingly, despite its purported interest in limiting the placement of
advertising signs along arterial highways in order to promote traffic safety and aesthetics, the
City itself is affirmatively placing *thousands* of its own advertising signs on so-called "street
furniture" – including bus shelters, newsstand kiosks, and pay telephones – along the City's
streets.

57.    The City has done so unabashedly in order to generate revenue,
notwithstanding the fact that the City's street furniture advertising is, if anything, more dangerous
and more aesthetically objectionable than Plaintiffs' arterial highway billboards allegedly are.

58.    Manhattan Borough President Scott Stringer says advertising "is an
important business component to the city." He merely opposes "an illegal market where the city
gets no benefit."

59.    Currently, there are over 3,000 bus shelters and nearly 13,000 public pay
telephones ("PPTs") on the curbsides of the streets of New York City. *All* of these structures
bear advertising, and thus all of them generate advertising revenues. Although this massive
amount of street-side advertising is placed and managed by private outdoor advertising
companies, the City of New York always gets its share of the take: in return for permitting the
placement of advertising on the City's sidewalks – a location which provides access to literally
millions of "eyeballs" a day – the City is paid a share of the gross revenues generated by such

-13-

advertising in the form of "franchisee fees." In addition, under current law, the City has also reserved for itself the right to place *its own* advertising -- public service announcements, promotional ads for the City, etc. – on these structures free of charge. Thus, even under the current regime applicable to bus shelters and PPTs, the City is very much a partner with private enterprise in exploiting the advertising potential of City streets and sidewalks.

60.     That partnership is about to expand significantly, providing the City with an even greater stake in the outdoor advertising business in New York City. In May 2006, after years of planning and a lengthy and complex bidding process which was marked by controversy and litigation, the City of New York approved a twenty-year, multi-billion dollar agreement with a Spanish outdoor advertising conglomerate, Cemusa Inc.. Known as the Coordinated Street Furniture Franchise ("CSFF"), this agreement calls for Cemusa to construct, own and manage more than 3,300 bus shelters, 330 new newsstands, dozens of automated public toilets, and other forms of street furniture (such as trash receptacles) on the sidewalks of the five boroughs.

61.     While the ostensible reason for the CSFF is to "coordinate" the design and appearance of street furniture across the city, in truth the new structures will have something else in common as well: all of them will be festooned with advertising that will generate ad revenues in which the City will share. Cemusa will place and manage the new advertising on each and every new structure, and the City, of course, will gets its share of the take: a whopping 50% of the gross revenues, plus as much as 22.5% of the space free of charge for public service announcements and use by the City's marketing partners.

62.     Over the twenty-year life of the CSFF, the City and Cemusa are *each* expected to rake in over $1 billion in advertising revenues, although the City, unlike Cemusa,

-14-

will have few if any offsetting costs. The $1 billion for the City will go directly to the City's

bottom line. In order to ensure this massive influx of cash to the City's coffers, the Coordinated

Street Furniture Franchise will firmly establish and in many respects expand the presence of

curbside advertising in New York City.

63.     The largest expansion of curbside advertising brought on by the CSFF is

the placement of back-lit advertising panels on at least 330 newsstands, all of which are located

on congested streets in the urban center. Prior to the CSFF, advertising on newsstands was

forbidden by city law. Under the CSFF, Cemusa will construct and own new newsstands up to

nine feet in height, and 6.5 feet in width. The majority of Cemusa-owned, to-be-constructed

newsstands will occupy the same locations that current individually-owned stands now occupy;

the difference is that the Cemusa stands will bear as much as 82.5 square feet of back-lit

advertising, whereas the current structures bear none. The two large advertising panels on

Cemusa-constructed newsstands will be visible to motorists on the City streets: one being the

panel on the side of the structure, which will be oriented perpendicular to oncoming traffic, and

the other being a very large panel on the rear of the structure, that will abut the street in a parallel

orientation. City rules allow advertising panels of up to seven feet in height and permit the siting

of the newsstand as little as 18 inches from the curbline; the effect is to permit gigantic

advertising signs immediately adjacent to the nearest lane of traffic.

64.     The Coordinated Street Furniture Franchise also calls for the construction

of at least 3,300 replacement bus shelters, and as many as 200 additional shelters to be built at

the City's request. These structures, as well, will be laden with advertising – up to 55 square feet

of back-lit advertising on two panels. Renderings show that the new Cemusa bus shelters are

-15-

designed to maximize the visual impact of the advertising on drivers; the advertising panels are oriented perpendicular to the street, with one side facing the lanes of oncoming traffic nearest to the curbline, and the other facing the opposite direction (which, on two-way streets, means it faces additional lanes of traffic on the other side of the street). Here again, the signage is expected to be very large – up to seven feet in height by City rule. And, although the large majority of Cemusa-constructed bus shelters will be replacements for existing structures, the possible addition of two hundred entirely new bus shelters to the curbside landscape promises to increase the overall visual impact of advertising that the City directly benefits from.

65.     Advertising placed pursuant to the CSFF will also appear on a third category of street furniture, namely automated public toilets ("APTs"). The CSFF calls for the construction of 20 curbside APTs around the City, each to provide maximum advertising space (in the form of back-lit panels) in the amount of 82.5 square feet. The signage may be as large as nine feet in height. While the absolute number of APTs in the City will be rather small, most of these structures will appear in the most congested parts of the City (principally in Manhattan) and, as curbside advertising platforms, will be oriented to present advertising both to pedestrians and to drivers.

66.     In addition to permitting traditional back-lit posters as the principal form of advertising, the CSFF also permits a new, more dynamic form of advertising: so-called "scroller" advertising, which allows a single back-lit advertising panel to serve as a platform for a scrolling series of posters which replace one another at short intervals. Scroller advertising permits a single platform to be used on a rotating basis by more than one advertiser, and seeks to capture the attention of viewers by virtue of its kinetic nature. Upon information and belief,

there currently are no advertising scrollers on curbside street furniture in New York City. The CSFF allows Cemusa to place up to 250 scrollers – each holding multiple different, rotating advertisements – at locations of Cemusa's choosing. In order to increase the revenues that they will generate, it is expected that Cemusa will locate these 250 scrollers, to the greatest degree possible, at the locations with the greatest number of "eyeballs" (pedestrian and vehicular traffic), with the largest available advertising platforms (*i.e.*, bus shelters and newsstands). Upon information and belief, by virtue of their rotating, kinetic nature, the 250 Cemusa scrollers will increase the visibility of and distraction caused by curbside advertising placed under the CSFF.

       67.     Quite apart from the three categories of advertising-bearing street furniture mandated by the CSFF (bus shelters, newsstands, and automated public toilets), advertising at the curbside and, indeed, on the streets and highways themselves, exists on other platforms as well. Most numerous are the curbside public pay telephones, of which there are just under 13,000 citywide, and which have been placed in some of the most congested areas of the city. Notably, in authorizing the franchises for PPTs, the City Council specifically called for PPTs to be placed in "locations with significant emergency demands such as *along arterial highways and at entrances to bridges and tunnels*." Typically, these structures have three advertising panels: one perpendicular to the street and facing oncoming traffic in the near lane; one comprising the rear of the structure that is parallel to the lane of traffic; and one on the far side of the structure, visible, in the case of streets running in two directions, from the lanes of traffic on the far side. As noted previously, the City shares in the advertising revenue generated by panels on PPTs. Likewise, the City uses the exteriors of its own buses as advertising platforms in the lanes of traffic themselves; allowing outdoor advertisers to mount large advertising signs on both the

-17-

sides and rear panels of each bus is yet another method of generating revenues for the City.
Finally, the City allows the owners of medallion taxi cabs – of which there are more than 13,000
– to mount back-lit and LED display advertising on the roofs of their vehicles. These mobile
advertising signs travel in and across the lanes of traffic on every street in the City.

68.    The advertising signs that the City permits on street furniture and on buses
and taxis are plainly more dangerous than Plaintiffs' arterial highway advertising signs allegedly
are. This is so for two reasons.

69.    First, the City's street furniture advertising signs are located along
uncontrolled access roadways – *i.e.*, regular city streets with traffic lights, stop signs, parked cars,
cyclists, and pedestrians. Plaintiffs' arterial highway billboards, in contrast, are located
predominantly along controlled access highways with no traffic lights or stop signs, no parked
cars, no cyclists, and no pedestrians. It is more dangerous to place an advertising sign along an
uncontrolled access roadway than a controlled access roadway because drivers have many more
stimuli to react to and face many more potential obstacles along uncontrolled access roadways.

70.    Second, because of their location relative to the vantage points of drivers,
the City's street furniture advertising signs are, if anything, more distracting – and hence more
dangerous – than Plaintiffs' highway advertising signs.

71.    That the City has auctioned off to the highest bidder the right to place
thousands of advertising signs along City streets – signs that are more dangerous than Plaintiffs'
arterial highway advertising signs – demonstrates that the City's regulation of outdoor
advertising is not narrowly drawn to its purported interest in promoting traffic safety.

-18-

## 2. Exempt Government Arterial Highway Billboards

72. The City has irrationally exempted from regulation numerous government-controlled billboards that are located along the City's arterial highways and that are no less dangerous or unsightly than Plaintiffs' arterial highway billboards are alleged to be.

73. The MTA has contracted with a major outdoor advertising company, CBS Outdoor, to operate advertising signs on MTA rights of way located along arterial highways in New York City.

74. The City has the power to compel the MTA to comply with the Zoning Resolution's requirements for advertising signs. In Opinion Letter 82-F20, former New York State Attorney General Abrams found precisely that the City of New York has the legal authority and power to compel the MTA to *remove billboards* that violate City zoning laws. Even if the City did not have such power (which it does), there is no evidence that the City has done anything to seek relief from the New York State legislature to permit the City to regulate the MTA in this area.

75. MTA's advertising billboards are no less dangerous or unsightly than Plaintiffs' arterial highway billboards are alleged to be.

76. The Port Authority has likewise contracted with a major outdoor advertising company, JCDecaux, to operate advertising signs on Port Authority rights of way located along arterial highways in New York City. JCDecaux has already placed advertising signs on LaGuardia Airport property along Grand Central Parkway, as well as a 6,000 square foot advertising sign on the approach to Lincoln Tunnel.

77. There is no evidence that the City has taken any steps whatsoever to

compel the Port Authority to comply with the Zoning Resolution's requirements for advertising

signs.

78.    The Port Authority's advertising billboards are no less dangerous or

unsightly than Plaintiffs' arterial highway billboards alleged to be. Indeed, the Port Authority

billboards are more dangerous because they often are located at or near bridge and tunnel

approaches involving significant lane merges.

79.    On information and belief, there are at least 70 advertising signs that have

been placed by the MTA or the Port Authority along arterial highways in New York City.

80.    The fact that the City has exempted, for no rational reason, MTA and Port

Authority signs from the requirement of the Zoning Resolution, even though those signs are no

less dangerous or unsightly than Plaintiffs' signs, demonstrates that the City plainly has no real

interest in promoting safety and aesthetics and that its regulatory scheme is not the least bit

narrowly drawn to achieving that purported interest.

81.    Even worse than turning a blind eye to arterial highway advertising signs

operated by the MTA and the Port Authority, the City makes a mockery of its purported arterial

highway billboard ban by operating advertising signs on its *own* property along arterial highways.

82.    To take just one example, in November 2005, the City acquired the High

Line – an inactive elevated rail structure on the west side of Manhattan that is within 200 feet of

an visible from the West Side Highway. In May 2006, the City entered into a contract with a

private company, Clear Channel, through which Clear Channel pays the City $85,000 per year in

exchange for the right to operate a large advertising billboard on the High Line near 34th Street.

On information and belief, the City has also entered into a contract with CBS Outdoor through

-20-

which CBS pays the City over $100,000 per year in exchange for the right to operate a large advertising billboard on the High Line near 14th Street. On information and belief, the City either owns or operates – and derives substantial revenues from – at least six arterial advertising signs in New York City.

83.     Indeed, in addition to deriving revenue from the lease of arterial highway billboard space located on City property, the City has also entered the arterial highway advertising market as a *customer*. In or about November 2004, the City entered into an option contract with private outdoor advertising companies entitling the City to advertise itself, including along arterial highways, at pre-negotiated prices if the City won its bid to host the 2012 Olympics.

84.     The City cannot credibly claim that it is sincerely concerned with the impact of arterial highway advertising signs on "safety and aesthetics" when the City allows the MTA and Port Authority to maintain signs that do not comply with the Zoning Resolution, leases out signs located on its property, and enters into contracts to use arterial highway billboards to communicate with the public to promote its own messages.

### 3.     Grandfathered and Exempted Arterial Highway Billboards

85.     Notwithstanding the City's purported interest in limiting the placement of arterial highway billboards in order to promote safety and aesthetics, the City has grandfathered a slew of non-conforming signs that are no less dangerous or unsightly than Plaintiffs' signs.

86.     Any advertising sign built before November 1, 1979 and located within 660 feet of an arterial highway is permitted to remain so long as it is not more than 30 feet high and 60 feet long. Z.R. §§ 32-662(2), 42-55(c)(2).

-21-

87.    On information and belief, approximately 150 advertising signs on arterial highway billboards that otherwise would not conform to the requirements of the Zoning Resolution qualify for grandfathered status under these provisions.

88.    These provisions demonstrate that the City's scheme is not narrowly drawn to achieving its stated goals because the grandfathered signs are no less dangerous or unsightly than Plaintiffs' signs are alleged to be.

89.    Indeed, these Zoning Resolution provisions are precisely backwards – and therefore particularly irrational – because they grandfather advertising signs that are located *within* 660 feet of an arterial highway but do not protect advertising signs located *beyond* 660 feet.

90.    For example, a 700 square foot advertising sign built in 1975 and located 600 feet from an arterial highway would be grandfathered even though it otherwise would be non-conforming (because its square footage would be more than its distance from the 200-foot radius, Z.R. §§ 32-662, 42-55(b)). The very same sign, however, would not be grandfathered if it were located 700 feet from an arterial highway (because it must be within 660 feet to qualify for the grandfather).

91.    One would expect that, if anything, the City would carve out from the grandfather those advertising signs that are located *too close* to arterial highways, not *too far*.

92.    The Zoning Resolution likewise exempts arterial highway advertising signs located within one-half mile of the boundary of New York City from the distance requirements that otherwise would apply, so long as such signs are spaced at least 500 feet apart. Z.R. § 42-55(d).

93. This rule is often referred to as the "Eddie Arrigoni rule," because, on information and belief, it was enacted in response to lobbying from Edward Arrigoni, the owner of New York Bus Sales, LLC, which operates a cluster of advertising signs along I-95 in the Bronx near the Westchester border.

94. On information and belief, there are approximately 13 advertising signs in New York City that qualify for treatment under this provision.

95. It makes no sense to exempt such signs from highway distance requirements because advertising signs located within one-half mile of the City boundary are no more or less dangerous or unsightly than signs located elsewhere in the City.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(42 U.S.C. § 1983 – First Amendment)

96. Plaintiffs repeat and reallege each of the foregoing paragraphs as if they were fully set forth at length herein.

97. The messages contained on Plaintiffs' arterial highway billboards constitute commercial speech that is entitled to full First Amendment protection.

98. The messages contained on Plaintiffs' arterial highway billboards are not misleading and do not relate to unlawful activity.

99. The City has no substantial interest that justifies the suppression of Plaintiffs' protected commercial speech.

100. The City's scheme for regulating outdoor advertising does not directly advance its purported interest in promoting traffic safety and aesthetics.

-23-

101.     The City's scheme for regulating outdoor advertising is not narrowly

drawn to its purported interest in promoting traffic safety and aesthetics.

102.     The City did not carefully calculate the costs and benefits of its scheme for

regulating outdoor advertising.

103.     The City's scheme for regulating outdoor advertising imposes content-

based restrictions on protected speech.

104.     The City's registration and certification requirements are almost

impossible to satisfy, are unduly burdensome, and themselves violate the First and Fourteenth

Amendments.

105.     The City's scheme for regulating outdoor advertising violates the First and

Fourteenth Amendments to the United States Constitution.

106.     Absent preliminary injunctive relief on or before October 24, 2006,

Plaintiffs will suffer irreparable harm.


WHEREFORE, Plaintiffs respectfully request judgment against Defendants as

follows:

1.     an order declaring that Z.R. §§ 32-662 and 42-55, Local Laws 14 and 31,
and DOB Rule 49 are unconstitutional on their face and as applied to Plaintiffs;

2.     an order preliminarily and permanently enjoining Defendants from
enforcing Z.R. §§ 32-662 and 42-55, Local Laws 14 and 31, and DOB Rule 49 against Plaintiffs;

3.     an order awarding reasonable attorneys' fees and costs; and

4.     an order directing such other and further relief as the Court may deem just
and proper.

Dated: October 10, 2006
      New York, New York

                  Respectfully submitted,

                  EMERY CELLI BRINCKERHOFF
                  & ABADY LLP

By: _____

                      Richard D. Emery (RE 5181)
                      Andrew G. Celli, Jr. (AC 3598)
                      Ilann M. Maazel (IM 5724)
                      Eric Hecker (EH 0989)

                  75 Rockefeller Plaza, 20th Floor
                  New York, N.Y. 10019
                  (212) 763-5000

                  Attorneys for Plaintiffs