UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ATLANTIC OUTDOOR ADVERTISING, INC.,                    No. 06 Civ. 8219
SCENIC OUTDOOR, INC., TROYSTAR CITY
OUTDOOR LLC, and WILLOW MEDIA, LLC.

                                        Plaintiffs,

        – against –

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER,

                                        Defendants.

-------------------------------------------------------------------x

## DECLARATION OF ANDREW G. CELLI, JR.

        ANDREW G. CELLI, JR., an attorney admitted to practice in this District,

declares under penalty of perjury, as follows:

        1.      I am a partner in the law firm of Emery Celli Brinckerhoff & Abady LLP,

counsel to the plaintiffs in the above-captioned matter, and I submit this declaration in further

support of plaintiffs' motion for a preliminary injunction, which is filed together herewith.  The

information provided herein is based upon my review of the attached documents and my personal

knowledge.

        2.      The purpose of this declaration is to provide this Court with materials

relevant to, and to briefly describe, certain sources of revenue to the City from curbside

advertising, including the Coordinated Street Furniture Franchise ("CSFF") and franchise

programs for curbside public pay telephones.

A.     **Background, Structure, Impact & Financial Terms of
       the Coordinated Street Furniture Franchise**

3.     The Coordinated Street Furniture Franchise is an agreement between the

City of New York and a Spanish outdoor advertising company known as Cemusa, Inc.,

("Cemusa"). The CSFF gives Cemusa the exclusive right to construct, own and manage more

than 3,300 bus shelters, 330 new newsstands, 20 automated public toilets, and other forms of

street furniture (such as trash receptacles) located on City property – specifically, on the

sidewalks of the five boroughs. As set forth more fully below, under the agreement, Cemusa will

sell advertising space on the newly-constructed, Cemusa-owned street furniture, and share the

gross revenues with the City of New York. In the process, the City and Cemusa together are

expected to realize more than $2 billion in revenues over the 20 year life of the CSFF. Annexed

hereto as Exhibit A is what I believe to be a true and correct copy of the Coordinated Street

Furniture Franchise between the City of New York and Cemusa, Inc., exclusive of attachments

(cited as "Ex. A, CSFF _____").

4.     The CSFF is the product of explicit City Council authorization, years of

planning, and competitive bidding. In March 2004, the City of New York's Department of

Transportation issued a Request for Proposals (the "RFP") seeking bids for the Coordinated

Street Furniture Franchise. Drawing upon the authorizing legislation and the Department of

Transportation's own expertise, the RFP set forth the needs as well as the financial, technical,

legal and other specifications dictated by the City for the Coordinated Street Furniture Franchise.

Annexed hereto as Exhibit B is what I believe to be a true and correct copy of the Request for

Proposals issued by the New York City Department of Transportation on March 26, 2004 (cited

2

as "Ex. B, RFP ____ ").

5.      Cemusa responded to the RFP with, *inter alia*, a Best and Final Offer

dated June 27, 2005, and a letter dated July 7, 2005 (collectively, the "Cemusa BAFO.")

Annexed hereto as Exhibit C is what I believe to be a true and correct copy of the Cemusa BAFO

(cited as "Ex. C, Cemusa BAFO").

6.      The Coordinated Street Furniture Franchise requires Cemusa to construct

own, maintain and exploit for advertising potential at least three different forms of street

furniture: bus shelters, newsstands, and automated pay toilets.  *See*  Ex. A, CSFF 2.4.6.  The

CSFF provides that, after twenty years, ownership of these structures reverts to the City of New

York.  Ex. A, CSFF 2.1; 13.4.

7.      The CSFF requires Cemusa to construct and maintain at least 3,300

replacement or new bus shelters, with as many as 200 additional bus shelters to be built at the

City's request.  Ex. A, CSFF 2.4.6 (a)(i).  These structures will bear up to 55 square feet of back-

lit advertising on two panels.  Ex. B, RFP Appendix 2.  Renderings show that the new Cemusa

bus shelters are designed to maximize the visual impact of the advertising; their advertising

panels are oriented perpendicular to the street, with one side facing the lanes of oncoming traffic

nearest to the curbline, and the other facing the opposite direction (which, on two-way streets,

means it faces additional lanes of traffic on the other side of the street).  Annexed hereto as

Exhibit D is what I believe to be a true and correct copy of the prototype of a Cemusa bus shelter.

The bus shelter signage will be up to seven feet in height.  Ex. B, RFP Appendix 2.

8.      The CSFF also requires Cemusa to construct at least 330 newsstands and

3

to place back-lit advertising panels on them.[1]  Ex. A, CSFF 2.4.6(d).  These new newsstands will stand up to nine feet in height and 6.5 feet in width; they will bear up to 82.5 square feet of advertising.  Ex. B, RFP Appendix 2.  When they are oriented facing the building line, as most newsstands are currently, the two large advertising panels extant on the Cemusa newsstands will be visible to motorists on the City streets:  one being the panel on the side of the structure, which will be oriented perpendicular to oncoming traffic, and the other being a very large panel on the rear of the structure, which will abut the street in a parallel orientation.  Annexed hereto as Exhibit E is what I believe to be a true and correct copy of a rendering of the prototype of a Cemusa newsstand.  Advertising panels on the new newsstands may be up to nine feet in height and the newsstands themselves may be sited as little as 18 inches from the curbline.  Ex. B, RFP Appendix 2.

9.      Advertising placed pursuant to the CSFF will also appear on automated public toilets ("APTs").  The CSFF requires the construction of 20 curbside APTs around the City, each to provide maximum advertising space (in the form of back-lit panels) in the amount of 82.5 square feet.  Ex. A, CSFF 2.4.6(b), Ex. B, RFP Appendix 2.  The signage may be as large as nine feet in height.  Ex. B, RFP Appendix 2.  Annexed hereto as Exhibit F is what I believe to be a true and correct copy of a rendering of the prototype of a Cemusa automated public toilet.

10.      In addition to traditional back-lit posters as the principal form of advertising, the CSFF also permits a new, more dynamic form of advertising:  so-called "scroller" advertising, which allows a single back-lit advertising panel to serve as a platform for a

---

[1] Prior to the CSFF, advertising on newsstands was forbidden by city law.  N.Y.C. Admin Code Sec. 20-231 (amended).

scrolling series of posters which replace one another at short intervals. Ex. A, CSFF 1.64; 4.4.2. Scroller advertising permits a single platform to be used on a rotating basis by more than one advertiser, and seeks to capture the attention of viewers by virtue of its kinetic nature. *Id.* The CSFF allows Cemusa to place up to 250 scrollers – each holding multiple different, rotating advertisements – at locations of Cemusa's choosing. Ex. A, CSFF 4.4.2. Upon information and belief, in order to increase the revenues that they will generate, it is expected that Cemusa will locate these 250 scrollers, to the greatest degree possible, at the locations with the greatest number of "eyeballs" (pedestrian and vehicular traffic), with the largest available advertising platforms (*i.e.*, bus shelters and newsstands). Upon information and belief, there currently are no advertising scrollers on curbside street furniture in New York City.

11. In exchange for the franchise awarded under the CSFF, Cemusa will compensate the City in three ways: *first*, by the construction and (after 20 years' time) the turnover to the City of the street furniture items themselves – bus shelters, newsstands and automated public toilets – as discussed above; *second*, by the sharing of gross revenues generated by advertising on the structures; and *third*, by the provision of free advertising space ("in-kind consideration") to the City.

12. In terms of cash, under the CSFF, Cemusa will pay the City the greater of: (x) 50% of all gross revenues generated from street furniture advertising; or (y) certain guaranteed cash payments. Ex. A, CSFF 9.2. Under the deal, in-kind consideration to the City – comprised of 2.5% of the all available advertising panels under Cemusa's control, to be used for public service messages, and 20% of the available panels, to be used for New York City corporate marketing messages – is valued at approximately $300 million over the life of the

agreement. Ex. C, Cemusa BAFO. Accordingly, the Coordinated Street Furniture Franchise is worth approximately $1.3 billion to the City over the twenty year life of the agreement – $65 million per year on average.

## B.   Other Sources of Ad Revenues for the City of New York

13.   The revenues and value generated by the CSFF is just one aspect of the total, direct economic benefit to the City of New York from curbside advertising. Quite apart from the CSFF, the City has benefitted and will continue to benefit financially from advertising on curbside public pay telephones ("PPTs"), of which there are approximately 13,000 citywide,[2] and on City bus-sides and back panels.

14.   By law, the City shares in the gross revenue generated by advertising panels on PPTs. Resolution No. 1043, Council of the City of New York, September 17, 2003 , Sect. 8. Additionally, by law the City has reserved for itself 2% of the total advertising space on PPTs for public service announcements. *Id.* Based upon my own observations, and as a fact that the Court may take judicial notice of, these structures typically have three advertising panels: one perpendicular to the street and facing oncoming traffic in the near lane; one that is parallel to the lane of traffic and that comprises the rear of the structure; and one on the far side of the structure, visible, in the case of streets running in two directions, from the lanes of traffic on the far side. Notably, in authorizing the franchises for PPTs, the City Council specifically called for PPTs to be placed in "locations with significant emergency demands such as *along arterial*

---

[2] *See* NYC Department of Information Technology & Telecommunications, http:/www.nyc.gov/html/doitt/ faq/faq_phone.shtml, September 17, 2006 (noting that, as of December 31, 2004, there were 12,862 PPTs at the curbside).

*highways and at entrances to bridges and tunnels.*" *Id.*, Section (2)(second).

15.     Likewise, based on my own observations, and as a fact that the Court may take judicial notice of, the City uses the exteriors of its own buses as advertising platforms in the lanes of traffic themselves.  Based on my observations, and as a fact that the Court may take judicial notice of, advertising typically appears on the two sides of a City bus, and on its rear panel.  My belief is that the City is paid to allow outdoor advertisers to mount large advertising signs on both the sides and rear panels of each bus.  Thus, the City generates revenues from advertising in this way as well.

## C.     Conclusion

16.     It is clear from the foregoing that advertising is and will continue to be a significant source of non-tax revenues for the City of New York.  This view was recently expressed by Manhattan Borough President Scott Stringer, who is quoted as saying that advertising "is an important business component to the city."  In the context of explaining the City's efforts to restrict advertising billboards through recent regulations, Borough President Stringer said that he opposes "an illegal market where the city gets no benefit."  Annexed hereto as Exhibit G is what I believe to be a true and correct copy of the Daily Media News item entitled "New York Cracks Down on Illegal Outdoor Ads," dated September 11, 2006.

Dated: October 26, 2006
        New York, N.Y.

Respectfully Submitted,

Andrew G. Celli, Jr

7