UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
CLEAR CHANNEL OUTDOOR, INC.,

                                                    Plaintiff,

                    -against-

THE CITY OF NEW YORK and PATRICIA J.                06-CV-8193 (PAC) (DCF)
LANCASTER, in her official capacity as Commissioner of
the New York City Department of Buildings

                                                    Defendants.
------------------------------------------------------------------------ x

------------------------------------------------------------------------ x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CITY OUTDOOR LLC,
and WILLOW MEDIA, LLC.,

                                                    Plaintiffs,

                    -against-                       06-CV-8219 (PAC) (DCF)

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER

                                                    Defendants.
------------------------------------------------------------------------ x

## DECLARATION OF SHERYL R. NEUFELD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**SHERYL R. NEUFELD**, declares pursuant to 28 U.S.C. §1746, under penalty of

perjury, as follows:

1.      I am an Assistant Corporation Counsel in the office of MICHAEL A.

CARDOZO, Corporation Counsel of the City of New York, attorney for the defendants in this

action.   I make this declaration in support of defendants' motion for summary judgment and in

opposition to plaintiffs' motion for a preliminary injunction based upon my review of records

maintained by the City of New York, discussions with City employees and upon the papers and

proceedings heretofore had in this action.  Specifically, I submit this declaration to recount the history of the City's regulation of signage in proximity to arterial highways.

**Early Zoning Regulations Concerning Outdoor Signs**

2.     In 1916, the City of New York became the first municipality in the country to undertake comprehensive zoning.  In 1940, the newly constituted New York City Planning Commission ("CPC") proposed a series of amendments, including a proposal to regulate outdoor signs.  The official CPC Report on the 1940 zoning amendments reveals that problems with outdoor advertising signs had already surfaced.  A copy of the Major Report of City Planning Commission, 1940 ("1940 CPC Report") with relevant 1940 zoning amendments, is provided herewith as Exhibit A.

3.     As set forth therein, "[b]illboards and signs not only dominate our business streets . . . but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches."  Exhibit A at 90.

4.     The signage restrictions proposed by the CPC and adopted by the City were intended to, among other things, stem a rapid increase in the number of outdoor advertising signs, particularly around the City's major highways and parks.  Advertising signs were to be treated differently from business/accessory signs because each represents a different land use from a zoning perspective.[1]

_____

[1] The current Zoning Resolution ("Z.R.") defines "use" as

> (a)     any purpose for which a building or other structure or a tract of land may be designed, arranged, intended, maintained, or occupied; or

5.      The 1940 zoning amendments reflected the City's differing interests in business signs, which were accessory to and drew attention to a business conducted on the same zoning lot, and advertising signs, which publicized activities or commodities offered elsewhere and, therefore, constituted independent and distinctive uses of the land.[2]   The amendments introduced the prohibition against placement of advertising signs in districts zoned for residence use and in the area within view and within 200 feet of City parks of over one-half acre, parkways and express highways. See Exhibit A at 90-91.

6.      This restriction was strictly related to land-use considerations, not the content of the message on particular signs.   The CPC recognized that business signs served an essential economic purpose; i.e., advising customers and suppliers of the location of a particular establishment.   In contrast, since advertising signs were not specifically related to a particular location, the adverse aesthetic impact of these signs should be prohibited along major highways in the interest of providing an attractive Cityscape along the City's major routes as an attraction for residents and visitors. At the same time, and in recognition of diversity of the City's districts, the CPC resolved that large outdoor advertising signs were appropriate uses in certain urban contexts such as Times Square and many of the City's Manufacturing Districts. Exhibit A at 90.

---

> (b)      any   activity,   occupation,   business,   or
> operation carried on, or intended to be carried on, in
> a building or other structure or on a tract of land.

Z.R. § 12-10.

[2] In the 1940 zoning amendments, a "business sign" was defined as a "sign which directs attention to a business or profession conducted upon the premises" and an "advertising sign" was defined as "a sign which directs attention to a business, commodity, service or entertainment conducted, sold or offered elsewhere than upon the premises." Exhibit A, 1940 Z.R. §1(q).

7.    Since 1940, the signage provisions of the Zoning Resolution have embodied this balanced view.  Thus, when the City adopted a comprehensive new Zoning Resolution in 1961 ("1961 Z.R."), it did not dramatically change the framework for regulating outdoor advertising signs.[3]  Relevant sections of the 1961 Z.R. are provided herewith as Exhibit B.  The 1961 Zoning Resolution generally permitted both accessory business signs and advertising signs in those Commercial Districts with higher intensity uses and in Manufacturing Districts [Z.R. § 42-52], while continuing the prohibition against advertising signs for those areas within 200 feet and within view of the City's major highways (designated in 1961 as "arterial highways") and parks.  Exhibit B, 1961 Z.R. §§42-53, 32-62, 32-63 and 32-66.

**1979 Zoning Amendments**

8.    Following the adoption of the 1961 Zoning Resolution, advertising signs were unlawfully erected in proximity to the City's arterial highways and public parks.  See City Planning Commission Report, January 30, 1980, ("1980 CPC Report"), a copy of which is provided herewith as Exhibit C, at page 1.

9.    In 1965, Congress enacted the Highway Beautification Act in order to "protect the public investment in such highways [i.e. the Interstate System and the primary system], to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. 131(a).  States that did not come into compliance with the requirements of the Highway Beautification Act risked losing up to 10% of the annual federal-aid highway funds that would have otherwise been disbursed to the State.  See 23 U.S.C. 131(b).

---

[3] For example, the 1961 Z.R. continued the business/advertising distinction, defining an "advertising sign" as "a sign which directs attention to a business, commodity, service or entertainment conducted, sold or offered elsewhere than upon the zoning lot" and a "business

10.    "In order to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with the purposes of [the Highway Beautification Act]," subdivision (d) of the Act authorized the Federal Secretary of Transportation to enter into agreements with the States to determine the size, lighting, and spacing of signs, displays, and devices which may be erected and maintained within 660 feet of "the nearest edge of the right-of-way within areas adjacent to the Interstate and primary systems which are zoned industrial or commercial under authority of State law." 23 U.S.C. 131(d).

11.    On May 13, 1968, the Federal government entered into an agreement with New York State whereby the State agreed that "in all areas within the scope of th[e] agreement, the State shall effectively control, or cause to be controlled, the erection and maintenance of outdoor advertising signs, displays, and devices erected subsequent to the effective date of th[e] agreement . . . ." See Federal-State 1968 Agreement, a copy of which is provided herewith as Exhibit D at NYC004688. Nothing contained in the agreement prohibited the State or the City from "exercising a greater degree of control of outdoor advertising than that required or contemplated by the Act." Id. at NYC004691.

12.    As explained by the City Planning Commission in its January 30, 1980 report, in order for the City (and therefore the State) to comply with the Highway Beautification Act, the City would have had to enforce the provisions of the Zoning Resolution against all advertising signs within 660 feet of an arterial highway. In addition, the City was required to show substantial enforcement progress by December 31, 1979, which would have had a significant adverse impact on the City's strained financial resources. Exhibit C at 1.

---

sign" as "an accessory sign which directs attention to a profession, business, commodity, service, or entertainment conducted, sold, or offered upon the same zoning lot." 1961 Z.R. § 12-10.

13.     As a result, in order to reduce the adverse impact on the City's enforcement manpower and funding and also avoid losing $25 million in federal funding, the CPC proposed, and the City enacted, amendments to the Zoning Resolution to "grandfather" certain existing illegal advertising signs near arterial highways in certain commercial and manufacturing zones while "retain[ing] the current stringent zoning controls in commercial and manufacturing zones for new advertising signs" along arterial highways and expanding the number of roads included in the arterial highway designation.  Exhibit C at 1-2.

14.     The signs that were "grandfathered" (i.e. given legal non-conforming use status) failed to comply with the more stringent standards set forth in the Zoning Resolution, yet were in compliance with the less restrictive federal and state standards.   Signs that did not comply with federal and state regulations remained illegal.  Exhibit C at 2.  In grandfathering certain existing advertising signs, the City incorporated the standards of the Federal Highway Beautification Act ("HBA") into the Zoning Resolution [Exhibit C at 1], implicitly adopting Congress' intent of improving safety and aesthetic appearance along the major highways.

**1998 Zoning Amendments**

15.     In 1998, following a decision in <u>City of New York v. Allied Outdoor Advertising</u>, 172 Misc.2d 707 (Sup. Ct. Kings Co. 1997), the Department of City Planning ("DCP") proposed amendments to the Zoning Resolution's signage provisions.  The 1998 Zoning Resolution amendments adopted by the CPC and enacted by the City Council clarify that non-commercial signs are permitted wherever any "signs" are permitted.  <u>See</u> <u>Report of the City Planning Commission</u>, dated February 18, 1998, and accompanying amendments, a copy of which is provided herewith as Exhibit E.

**2001 Zoning Amendments**

16.     Due to a proliferation of legal and illegal signs throughout the City, in 2000, the Department of City Planning decided that further revision to the Zoning Resolution's signage provisions was necessary.  Among other things, the amendments proposed by DCP (and subsequently adopted by the CPC) established size, height and projection requirements for all signs in Manufacturing zoning districts and limited the size of accessory business signs in Commercial and Manufacturing zoning districts at locations along designated arterial highways.[4] See, generally, CPC Report, dated December 13, 2000 ("2000 CPC Report"), a copy of which is provided herewith as Exhibit F.

17.     As reiterated by the CPC in the 2000 CPC Report, "the City of New York, like many jurisdictions elsewhere throughout the nation, has long recognized that outdoor advertising raises aesthetic, public safety and other issues that warrant reasonable restrictions on the size, height, projection and other features of outdoor advertising sign installations."  Exhibit F at 2.  As a result, "[t]he Zoning Resolution has for many years included comprehensive regulations for outdoor advertising signs, with controls that vary according to the nature and character of the zoning district."  Id. at 3.  Thus, while recognizing on the one hand that outdoor advertising is "an important vehicle for promoting the sale of goods and services," and that "the outdoor advertising business is an important industry in its own right," the CPC determined that the continued proliferation of both legal and illegal outdoor advertising signs throughout the City necessitated some revision to the zoning controls that had remained largely unchanged since 1961.  Id. at 1-3.

18.    With respect to the need to limit the size of accessory business signs in Commercial and Manufacturing zoning districts at locations along designated arterial highways, the CPC stated:

> Along arterial highways and public parks, there is a strong economic incentive to thwart existing prohibitions against advertising signs by converting accessory signs to advertising. This problem can be addressed by enhancing the City's powers to enforce against illegal sign installations. However, reasonable restrictions on the size of accessory signs in proximity to the arterial highways and public parks can also significantly reduce the incentive for illegal conversion.

Exhibit F at 4-5.

19.    Thus, DCP proposed an amendment which would limit the size of accessory signs within 200 feet of and within view of a public park one-half acre or more or a designated arterial highway to a maximum surface area of 200 square feet.[5]  Beyond 200 feet, accessory signs would be permitted to be 200 square feet plus one additional square foot of surface area per additional foot or distance from the park or highway.[6]  These regulations would apply in C4, C5-4, C6, C7 and C8 districts (which previously permitted accessory signs with a

---

[4] However, accessory signs erected prior to December 13, 2000 have non-conforming use status with respect to their size as of that date provided that DOB issued a permit for the sign on or before that date. See Z.R. §§ 42-58, 52-82.

[5] This size limit was subsequently raised to 500 square feet by the City Council. See Z.R. §§ 32-661 and 42-55.

[6] DCP also proposed that in very limited instances this limitation could be waived by the certification of the Chairman of the City Planning Commission for a single non-flashing sign located on a zoning lot of not less than one and one-half acres. Exhibit F at 12.

surface area greater than 200 square feet) and in all manufacturing zoning districts (which previously did not limit the size of accessory signs).[7] Exhibit F at 12.

   20. In addition to this amendment, DCP left essentially unchanged (but renumbered) the prohibition against advertising signs in Commercial and Manufacturing Districts within 200 feet and within view of the City's arterial highways and larger public parks. Z.R. §§ 32-662 (previously §32-66) and 42-55 (previously §42-53).[8] So as to aid New York City outdoor advertisers in maintaining a competitive equality with advertisers that operate immediately outside of the City's boarders, while at the same time trying not to compromise the City's interest in reducing the harm caused by outdoor advertising signs, DCP also proposed allowing signs (both accessory and advertising) along designated arterial highways within ½

---

[7] Significantly, at his deposition in this matter, Mark D. Geraghty, an attorney who has worked with outdoor advertising companies since 1991, admitted that he agrees that the size restrictions introduced in the 2001 zoning amendments are likely to reduce instances of signs being illegally converted from accessory to advertising use. See Geraghty March 18, 2008 Deposition Transcript ("Geraghty Dep. Tr."), relevant portions of which are provided herewith as Exhibit G, at p 31, ln 20 – p. 32, ln 1. Mr. Geraghty's assertions that the City has somehow been delinquent in enforcing these size restrictions are misleading for several reasons. See Affirmation of Mark D. Geraghty in Support of Plaintiff Clear Channel's Motion for a Preliminary Injunction ("Geraghty Aff."), ¶¶ 27, 38. First, Mr. Geraghty admitted at his deposition that there haven't been many instances of DOB issuing permits for signs exceeding the size limits set forth in the 2001 amendments, and that in some instances new signs have been erected without obtaining any permits from DOB. See Geraghty Dep. Tr. at p. 32, ln 4 – p. 33, ln 2 and p. 34, ln 15- p. 35, ln. 1. Second, with respect to renewing accessory permits for non-conforming signs, as stated in the CPC's December 13, 2000 Report [Exhibit F], the 2001 amendments added a new section [42-58] to "eliminate any potential ambiguity concerning the status of signs in Manufacturing Districts which pre-exist [the Amendments] and do not conform to the size, height or projection requirements of the new regulations. Simply stated, all such signs which are both allowed under current zoning and have permits from the Department of Buildings will be governed by the non-conforming use provisions of Sections 52-82 and 52-83." Exhibit F at 35. Thus, to the extent accessory permits were renewed, such renewal was entirely proper.

[8] The 2001 amendments also left unchanged, though renumbered, the prior §§32-66 (now §32-662) and §42-53 (now §42-55(b)) which provided that, while advertising signs may be located more than 200 feet from such arterial highways and parks, the sign's square feet of surface area must be no more than the number of linear feet from the highway or park.

mile of a boundary of the City of New York. Z.R. 42-55(d). <u>See</u> Exhibit F at 13. <u>See</u> <u>also</u>, Relevant portions of the transcript of testimony given by CPC Chairman Rose at the CPC's August 7, 2000 Public Hearing, which are provided herewith as Exhibit H.

21. On November 29, 2000, the CPC held a public hearing on the proposed amendments. Relevant portions of the transcript of testimony given at the November 29, 2000 public hearing are provided herewith as Exhibit I. Many of the speakers in favor of the zoning amendments noted that advertising signs had proliferated along the arterial highways in manufacturing zoning districts in the mid-to-late 1990s. Specifically, "[t] he Brooklyn Deputy Borough President offered testimony that there are now 140 advertising signs within 200 feet of arterial highways in that borough, increasing from 26 apparently illegal signs at such locations in 1994," and "[a] city councilmember from Queens observed that there has been a proliferation of illegal advertising billboards in his district along the Long Island Expressway near the Midtown Tunnel." Exhibit F at 22. <u>See</u> <u>also</u>, Exhibit I at 3-7 and 36-39. Moreover, Timothy Stauning, then President of the New York Outdoor Group (a then-existing industry group comprised of several Outdoor Advertising Companies) and Eastern Region President of plaintiff Clear Channel, admitted to the CPC that "the outdoor advertising industry unquestionably employed creative methods to obtain building permits for arterial highway signs." Exhibit I at 73. When questioned by CPC Chairman Rose, Mr. Stauning did not dispute that the outdoor advertising industry routinely claimed that advertising signs were to be used for accessory business purposes in order to obtain permits from the Department of Buildings ("DOB"). <u>Id.</u> at 73-75. Indeed, Clear Channel admits that its predecessors obtained Accessory Use permits for the vast majority of arterial sign faces in Clear Channels' current inventory and used them as advertising signs

prior to Clear Channel's acquisition of those predecessors.  See Stipulations of Fact, ¶ 133.[9]

Clear Channel also admits that it continues to use the majority of signs in its inventory as

advertising signs.  See Stipulations of Fact, ¶¶ 136-9.

      22.    After months of hearings, numerous submissions from public officials,

community residents and representatives of the outdoor advertising business, the CPC approved

DCP's proposed zoning amendments (with several slight modifications).  See Exhibit F.  During

the course of the public hearing at which the zoning amendments were adopted by the CPC, the

Commissioners resoundingly urged enactment by the City Council of companion enforcement

legislation that had been proposed by the City, as they recognized that effective enforcement

mechanisms were the key to a long-term solution to the proliferation of signage throughout the

City.  See Transcript from the CPC's December 13, 2000 public hearing, a copy of which is

provided herewith as Exhibit J.

      23.    The CPC's zoning amendments were adopted by the City Council on

February 27, 2001.  A copy of City Council Resolution Number 1772 is provided herewith as

Exhibit K.  With the addition of the new regulations adopted in 2001, the City enhanced its

comprehensive scheme with respect to outdoor signage which had already been firmly

established with the 1961 Zoning Resolution.  As of 2001, the Zoning Resolution now includes,

*inter alia*, restrictions on the location, size and height of all signage in Commercial Districts and

in Manufacturing Districts.  See, e.g., Z.R. §§ 32-64, 32-65, 42-531, 42-532, 42-533, 42-543.  As

previously noted, it also includes restrictions on the size of accessory signs located within close

proximity of arterial highways and parks, in order to prevent the illegal conversion of sign copy

from accessory to advertising messages.

---

[9] The Parties' Stipulations of Fact, dated May 12, 2008, is provided as Exhibit ZZ.

**2001 Administrative Code Amendments**

      24.     So as to provide the City with more effective enforcement tools to combat the issues posed by illegal signage, in addition to adopting the CPC's zoning amendments, on February 27, 2001, the City Council also adopted Intro. 809-A, amending Titles 26 and 27 of the Administrative Code of the City of New York ("Administrative Code").   A copy of the <u>Joint Report of the Land Use Committee and the Subcommittee on Zoning and Franchises</u>, dated February 6, 2001, is provided herewith as Exhibit L.   Intro 809-A was adopted by the council after extensive review, including a January 9, 2001 hearing before the City Council's Zoning and Franchises Subcommittee.   At the January 9, 2001 hearing, the Zoning and Franchises Subcommittee heard testimony from several members of the outdoor advertising industry, including Timothy Stauning.   Relevant portions of the transcript of the January 9, 2001 hearing transcript are provided herewith as Exhibit M.   As part of his testimony, Mr. Stauning urged the City Council to modify the City's outdoor advertising regulations such that new advertising signs would be prohibited within proximity to the City's arterial highways while allowing those signs that had been issued permits (even if for the display of accessory copy) by DOB to continue to exist as advertising signs.   <u>See</u> Exhibit M at 64-5.

      25.     Intro 809-A created an enhanced enforcement scheme directed at ensuring compliance by Outdoor Advertising Companies with provisions relating to outdoor advertising signs in the Zoning Resolution and in the Administrative Code.   <u>See</u> Exhibit L.   A more detailed discussion of the reasons for the need for an enhanced enforcement scheme is contained in the accompanying Declaration of Phyllis Arnold, Deputy Commissioner for Legal Affairs and the Chief Code Counsel for DOB.

26.     While the zoning amendments became effective immediately upon their adoption by the City Council, Intro 809-A did not become law until March 19, 2001 when it was signed by Mayor Giuliani as Local Law 14/2001 ("Local Law 14").  A copy of Local Law 14 is provided herewith as Exhibit N.

27.     In signing Local Law 14, Mayor Giuliani explained its purposes as follows: "[The Law is intended to] enable the City to stop unsightly, illegal signs from inundating neighborhoods across the five boroughs."  See Mayor's Statement at the March 19, 2001 Public Hearing, a copy of which is provided herewith as Exhibit O at p. 2.  He cited as well the safety rationale for the legislation.  Specifically, the Mayor stated that the Local Law and the related Zoning Resolution amendments will be useful to

> Combat[] the proliferation of advertising signs along our highways that have been installed in violation of existing zoning requirements that have been in effect for many years.  New York City was a pioneer in highway beautification, with the current prohibition on advertising along highways adopted as early as 1940 under the LaGuardia Administration.
>
> The City Planning Commission of that era recognized that billboards and other signs along the highways are an aesthetic harm.  As a result, the Commission adopted a provision, still in effect today, prohibiting advertising signs within view from, and within a distance of, two hundred feet from parks, parkways and express highways.  In the current debate over outdoor advertising, the sign companies have suggested that we abandon this provision, grandfather illegal signs on the highways and near parks, and allow new advertising signs to be installed.  The City Planning Commission and the City Council have wisely chosen to reject these requests.
>
> At the same time that it prohibited advertising signs, the City recognized in 1940 that its interests in traffic regulation and highway beautification

> should yield to allow accessory signs along the
> highways, in recognition of the legitimate needs of
> commercial enterprises....
>
> The City Planning Commission Report remains as
> compelling today as it was in 1940. Intro[.]
> Number 809-A reaffirms this now 60-year old
> policy by giving the City the tools to combat illegal
> advertising signs along the highways and elsewhere.

Exhibit O at 3-4.

28.     As set forth therein, Local Law 14 did not become effective until ninety

days after it was signed by Mayor Giuliani. Moreover, many of the provisions of Local Law 14

required DOB to promulgate rules establishing procedures and guidelines, as a precondition to

implementation. See Exhibit N.

29.     For reasons that are explained in the accompanying Declaration of Phyllis

Arnold, despite their best efforts, DOB was initially unable to promulgate the rules necessary to

implement Local Law 14. As a result, as Arnold explains, the Administration and the Council

worked together to amend Local Law 14. The first effort was the 2003 introduction of Intro 502.

Intro 502, however, was adjourned *sine die* at the end of the 2003 legislative session. The next

effort was Intro 423, introduced by the City Council in the summer of 2004. The end result of

those efforts was the City Council's April 12, 2005 adoption of Intro 423-A.

30.     Prior to passing Intro 423-A, the Council held several hearings and

consulted with the administration, members of the outdoor advertising industry and interested

civic and community groups. See Transcript of the City Council Land Use Committee's October

6, 2004 hearing, relevant portions of which are provided herewith as Exhibit P at 26-7, 54 and

65-6; Transcript of the City Council Land Use Committee's March 2, 2005 hearing, relevant

portions of which are provided herewith as Exhibit Q, at 11-2, 49, 55 and 71 and Transcript of

the City Council Land Use Committee's March 16, 2005 hearing, relevant portions of which are provided herewith as Exhibit R, at 6-9 and 19-20.

31.    As explained in the Arnold Declaration, Intro 423-A, which was signed into law as Local Law 31 of 2005 by Mayor Bloomberg on April 28, 2005, amends Local Law 14 in several ways, the most significant of which is the repeal of the provisions of Local Law 14 that hindered DOB's rulemaking efforts. A copy of Local Law 31 of 2005 is provided herewith as Exhibit S.

32.    As further explained in the Arnold Declaration, after the adoption of Local Law 31, DOB set about the task of drafting rules to implement the new billboard enforcement legislation. Copies of DOB Rule 49 as initially proposed on August 15, 2005 and as finally promulgated on July 26, 2006 are provided herewith as Exhibits T and U, respectively. Local Law 14, as amended by Local Law 31 and Rule 49 provide DOB with tools to enforce the decades old prohibition against erecting advertising signs in proximity to the City's arterial highways and larger public parks. Moreover, as explained by Deputy Mayor Doctoroff during his deposition in this matter, raising revenue for the City, through the Coordinated Street Furniture Franchise and otherwise, did not play any role in the City's decision to promulgate and/or enforce regulations with regard to Arterial Advertising Signs. See Doctoroff March 11, 2008 Deposition Transcript, relevant portions of which are provided herewith as Exhibit V, at p. 77-78 and 87-88.

33.    For all the reasons set forth in the defendants' accompanying memorandum of law, defendants respectfully request that their motion for summary judgment be granted in its entirety.[10]

34.    In addition, the following documents, referenced in the accompanying Declarations of Phyllis Arnold, dated May 12, 2008; Christina L. Hoggan, dated May 12, 2008; Kerry Gould-Schmit, dated May 12, 2008; Stanley Shor, dated May 9, 2008 and Yvon Cantave, dated May 9, 2008, and in the Defendants' Memorandum of Law and Statement Pursuant to Local Rule 56.1, dated May 12, 2008 are provided herewith:

- Excerpts from the Transcript of the February 29, 2008 Deposition of Timothy Stauning are provided as Exhibit W.

- DOB Directive 14 of 1975 is provided as Exhibit X.

- A copy of the Cashier's receipt referenced in the Geraghty Aff. is provided as Exhibit Y.

- DOB Permit "To Legalize Advertising Sign Bulletin" is provided as Exhibit Z.

- October 12, 1979 Memorandum written by then DOB Commissioner Irwin Fruchtman is provided as Exhibit AA.

- March 14, 1980 Memorandum written by then DOB Deputy Commissioner Irving Minkin is provided as Exhibit BB.

- A Collection of DOB Permits is provided as Exhibit CC.

- A DOB POC-1 Form is provided as Exhibit DD.

- City Planning Commission Report, dated February 4, 1978, is provided as Exhibit EE.

---

[10] However, if the Court finds any portion of the Local Laws or Rules unconstitutional, defendants request the opportunity to be heard as to whether the provisions of law found to be unconstitutional are capable of being severed from the regulatory scheme as a whole, as set forth in the accompany memorandum of law.

- Excerpts from the Franchise and Concession Review Committee hearing, dated December 29, 2005, are provided as Exhibit FF.

- RFP for CSFF as issued on January 17, 1997, is provided as Exhibit GG.

- City Council Resolution No. 1004 is provided as Exhibit HH.

- Excerpts from Cemusa Agreement, dated May 19, 2006, are provided as Exhibit II.

- Excerpts from RFP for CSFF as issued on March 26, 2004, are provided as Exhibit JJ.

- City Planning Commission Report, dated October 9, 1996, is provided as Exhibit KK.

- City Council Resolution No. 2096 is provided as Exhibit LL.

- October 3, 2003 Memorandum written by DOT General Counsel Philip Damashek is provided as Exhibit MM.

- March 19, 2004 Memorandum written by DOT General Counsel Philip Damashek is provided as Exhibit NN.

- October 8, 2003 and March 19, 2004 letters written by DCP General Counsel David Karnovsky are provided as Exhibit OO.

- List of Newsstands existing as of January 2008 is provided as Exhibit PP.

- DoITT Report on Amendments to Department Rules, Title 67 of the Rules of the City of New York, Section 6-06, Section 6-32 and Section 6-38, dated October 5, 2004 is provided as Exhibit QQ.

- Excerpts from EAS and Negative Declaration for CEQR No. 96 DoITT 001Y, dated May 3, 1996, are provided as Exhibit RR.

- Advertising Panel Franchise Agreement, dated March 3, 1988, is provided as Exhibit SS.

- Advertising Panel Franchise Agreement, dated July 1, 1993, is provided as Exhibit TT.

- City Council Resolution No. 439-A is provided as Exhibit UU.

- City Council Resolution No. 2248 is provided as Exhibit VV.

- Local Law 68 of 1995 is provided as Exhibit WW.

- Excerpts from Sample PPT Franchise Agreement are provided as Exhibit XX.

- Pictures from October 16, 2007 Driving Tour are provided as Exhibit YY.

- The Parties' Stipulations of Fact, dated May 12, 2008, is provided as Exhibit ZZ.

Dated:     New York, New York
           May 12, 2008

                                    _Sheryl R. Neufeld_
                                    Sheryl R. Neufeld