**EXHIBIT ZZ Part 1 of 13**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

CLEAR CHANNEL OUTDOOR, INC.,

                Plaintiff,

       - against -

THE CITY OF NEW YORK and PATRICIA J. LANCASTER, in her official capacity as Commissioner of the New York City Department of Buildings,

             Defendants.

-------------------------------------------------- x

ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC OUTDOOR, INC., TROYSTAR CORPORATION, and WILLOW MEDIA, L.L.C.,

              Plaintiffs,

       - against -

CITY OF NEW YORK, PATRICIA J. LANCASTER, and EDWARD FORTIER,

             Defendants.

-------------------------------------------------- x

No. 06 Civ. 8193 (PAC) (DF)

**STIPULATIONS OF FACT**

No. 06 Civ. 8219 (PAC) (DF)

The parties agree to the following stipulations of fact, solely for purposes of the above-captioned actions. Such stipulations of fact shall not be used outside the context of the above-captioned actions and shall not constitute an admission for any other purpose.

**I.**     **Definitions**

    1.     "ZR" shall refer to the New York City Zoning Resolution.

    2.     As defined in ZR §12-10 an "Advertising Sign" is "a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same zoning lot and is not accessory to a use located on the zoning lot."

3.      "Arterial Highways" shall be defined as the designated roadways listed in Appendix C to the New York City Zoning Resolution.

4.      An "Arterial Advertising Sign" shall refer to an Advertising Sign (as defined in ZR § 12-10) within 200 feet of and within view of an Arterial Highway.

5.      An "Accessory Sign" (formerly known as a "Business Sign") is a sign on a zoning lot that directs attention to a business or profession conducted on the same zoning lot.

**II.     Regulations**

6.      In 1940, the City of New York amended the Zoning Resolution to prohibit Arterial Advertising Signs.  Subject to certain size restrictions, Accessory Signs are permitted within 200 feet of and within view of Arterial Highways.

7.      Notwithstanding the Arterial Advertising Sign prohibition, during the period between 1940 and 1979, certain Arterial Advertising Signs were erected and maintained in violation of the Zoning Resolution.

8.      In 1979-80, New York City faced an impending loss of $25 million in Federal Highway aid unless it came into compliance with  the federal Highway Beautification Act.  In January 1980, the City Planning Commission ("CPC") concluded that, "Enforcement will have a significant adverse impact on the City's financial resources." As a result, instead of pursuing enforcement, the CPC proposed amendments to the Zoning Resolution to, *inter alia*, grant legal non-conforming use status to those existing signs near Arterial Highways in commercial and manufacturing zones that failed to comply with the standards in the City's Zoning Resolution, yet did comply with the less restrictive Federal and State standards. Those existing signs that did not comply with Federal and State standards remained illegal.  In addition, the CPC  "retain[ed] the current stringent zoning controls in commercial and manufacturing zones for new advertising signs" along Arterial Highways.

9.     Notwithstanding the continued Arterial Advertising Sign prohibition, Arterial Advertising Signs continued to be erected between 1979 and 2001. In many instances Outdoor Advertising Companies erected these Advertising Signs after applying for and obtaining Accessory Sign permits and later converting the accessory copy to advertising copy. In other limited instances, Arterial Advertising Signs were erected without obtaining any permits at all. Other than the "grandfathered" signs discussed in Paragraph 8, in no instances did the City issue new Advertising Sign permits.

III.   **Enforcement**

10.     As a result of amendments to the Zoning Resolution in 1979, in late 1979 and early 1980 many of the existing arterial advertising signs were legalized. After the legalization, during the 1980's there was minimal enforcement by the City of the zoning restrictions related to the placement of advertising signs in proximity to the City's Arterial Highways (currently ZR §§ 42-55 and 32-662) ("the Arterial Highway Restrictions"). From 1990-1998, City records establish that in response to community complaints, the City pursued a limited number of criminal court and nuisance abatement actions against advertising signs that were placed in violation of the Arterial Highway Restrictions. From 1999-2001, the Department of Buildings issued hundreds of "Notices of Violation" ("NOV") and instituted hundreds of criminal court prosecutions for violations of the provisions of the Zoning Resolution applicable to advertising signage. However, without looking at each of the individual NOVs, it is not possible for the City to determine how many were written for violations of the Arterial Highway Restrictions.

11.     Between November 1, 1979 and the adoption of amendments to the Zoning Resolution on February 27, 2001, the Department of Buildings of the City of New York issued accessory sign permits for no fewer than 250 to 300 sign faces within 200 feet and within view of an Arterial Highway.

12.    From 2002 through 2006, the City issued 66 NOVs to billboards on Arterial Highways based on violations of ZR §§ 42-55 and 32-662. In each individual year, the NOVs were issued as follows: 12 in 2002; 35 in 2003; 7 in 2004; 5 in 2005; and 7 in 2006. Further, the NOVs were issued on the following number of days per year: 4 days in 2002; 14 days in 2003; 5 days in 2004; 4 days in 2005; and 5 days in 2006.

IV.    **Advertising Signs on City Property**

13.    Until December 31, 2007, there were two Arterial Advertising Signs on City property within 200 feet of and within view of the Belt Parkway in Brooklyn, on opposing faces of the same structure at approximately 2647 Stillwell Avenue. The signs were located in Boro 3 (Brooklyn), Block 7247, Lot 999, 300 feet East of Stillwell Avenue. The signs faced east and west and measured 20' x 48'.

14.    The City had licensed Clear Channel to display advertising on these signs since January 1998. In 2005, the City and Clear Channel entered a new license agreement, authorizing Clear Channel to advertise on the signs from July 1, 2005 through June 29, 2006, for a fee of $5,000 per month. This agreement was informally renewed on a month-by-month basis through December 31, 2007. In the fall of 2007, the City of New York informed Clear Channel that it did not wish to renew the license agreement and requested that Clear Channel take down the two signs immediately. At Clear Channel's request, the City permitted the signs to remain until December 31, 2007 so that Clear Channel could honor the remainder of an agreement with an advertiser. The two signs were removed by December 31, 2007.

15.    There are two Arterial Advertising Signs on City-owned property within 200 feet of and within view of the West Side Highway at 145th Street. These signs are located in Manhattan on Block 2101, Lot 100, adjacent to the West Side Highway, 377 feet north of 145th

Street.  The signs face north and south and measure approximately 600 square feet each.  The signs have stood on City land since at least 1995.

16.      By service of a notice of petition and petition dated December 16, 2004, the City commenced a holdover proceeding against Vista Media.  Pursuant to a settlement of that litigation (originally signed February 23, 2005 and March 2, 2005, an amendment of which was signed June 14, 2006 and July 5, 2006) , the City permitted these signs to continue to bear advertising copy until September 30, 2008, at which time, pursuant to that agreement, the signs and structures must be removed by Vista Media.  In accordance with the two settlement agreements, between February 2005 and September 2008, the City will have collected $343,865 from Vista from these two signs.  Of that amount, $146,365.00 represents the payment of use and occupancy arrears prior to and including February 2005 and the remainder represents use and occupancy in the amount of $3,250.00 per month for the period from March 2005 through December 2005 and use and occupancy in the amount of $5,000.00 per month for the period from January 2006 through September 2008.

17.      The City acquired the "High Line" on November 4, 2005.  On February 27, 2006, the City met with three major outdoor advertising companies, all of whom had had leases for various Arterial Advertising Signs on the High Line with CSX Transportation, the High Line's previous owner, during the time the High Line was under its jurisdiction.  The meeting was held in the Green Conference Room at City Hall and was attended by representatives of the Office of the Deputy Mayor for Economic Development and Rebuilding, the Parks Department, the Law Department and New York City Marketing.

18.      Subsequently, on May 10, 2006, Clear Channel met with Jennifer Sun, a  Policy Advisor in the Deputy Mayor's Office and New York City Marketing, and reached agreement to lease an Arterial Advertising Sign on the High Line at 12th Avenue and West 34th Street for

5

$85,000 a year.  The sign was within 200 feet of and within view of the West Side Highway and had a surface area of 960 square feet.

19.      The City drafted a written agreement with Clear Channel to operate/maintain this sign.  Pursuant to this agreement (which was never executed), Clear Channel agreed to pay the City $85,000 per year as a base fee, plus 50% of gross receipts in excess of $170,000.  The agreement further provided that Clear Channel would retroactively pay the City a minimum of $80,959 for the time period during which Clear Channel posted advertising on the signs without a written agreement with the City (November 4, 2005 through approximately the summer of 2006).

20.      Following the commencement of this litigation, the City declined to execute the draft agreement, having determined that it did not wish to maintain advertising signs on the High Line.  Accordingly, Clear Channel did not make any payments to the City for the posting of this sign on the High Line, but rather held the money in reserve.  The City permitted Clear Chanel to maintain and operate the Arterial Advertising Sign on the High Line from November 4, 2005 to July 2007.  In a letter dated June 19, 2007, the City requested that Clear Channel remove this sign from the High Line.  Clear Channel removed this sign from the High Line on July 27, 2007.

21.      The City also drafted a written agreement with CBS to operate/maintain two Arterial Advertising Signs on the High Line at 11th Avenue and West 30th Street and 10th Avenue and West 30th Street.  These signs were within 200 feet of and within view of the West Side Highway and measured 1200 square feet.

22.      Pursuant to this agreement (which was never executed), for the sign at 11th Avenue and 30th Street, CBS was to pay the City $100,000 per year as a base fee, plus 50% of gross receipts in excess of $200,000.  For the sign at 10th Avenue and 30th Street, CBS  was to pay the City $75,000 per year as a base fee, plus 50% of gross receipts in excess of $150,000.

The agreement further provided that CBS would retroactively pay the City $131,112.16 for the time period during which CBS posted advertising on the signs without a written agreement with the City (November 4, 2005 through approximately the summer of 2006).

23.     Following the commencement of this litigation, the City declined to execute the draft agreement, having determined that it did not wish to maintain advertising signs on the High Line.  Accordingly, the City did not receive any payments from CBS for the posting of these signs on the High Line.   The City permitted CBS to maintain/operate the two Arterial Advertising Signs on the High Line from November 4, 2005 to July 2007.  In a letter dated June 19, 2007, the City requested that CBS remove these signs from the High Line.  As of September 4, 2007 the signs had been removed by CBS.

24.     There is a 26' x 48' double-faced Arterial Advertising Sign in a City-owned parking lot at Yankee Stadium, within 200 feet of and within view of the Major Deegan Expressway (the "Yankee Stadium Billboard").   The Yankee Stadium Billboard bears an illuminated electronic display which displays changing digitally projected advertisements.  The application to erect this sign was filed with the DOB with assurances that it would be used exclusively as an accessory business sign to Yankee Stadium.  The sign displays both off-site advertising copy (for advertisers such as Adidas, Mohegan Sun, Empire Blue Cross Blue Shield, Foot Locker) and non-commercial copy.

25.     The Yankee Stadium Billboard is located on property under the jurisdiction of the Parks Department and licensed to Central Parking Systems.  Pursuant to the City's agreement with Central Parking Systems (formerly Kinney System, Inc.), all signs within the Yankee Stadium parking lot must be approved by the City.  The City receives fees from Central Parking Systems in exchange for allowing it to operate the parking lot.

26.     When the Yankee Stadium Billboard was first erected in 1984, the DOB and Parks Department notified the Yankees that they were required to eliminate the advertising components of the sign or seek a variance.  The Yankees neither took down the advertising nor received a variance.  Current City employees are not aware of any efforts taken by the City to compel compliance with the ZR since then.

27.     From 1994 through March 2002, the City was party to a contract which permitted an Arterial Advertising Sign to be maintained on City property in Staten Island, on the West Shore Expressway, north of Meredith Avenue, within 200 feet of and within view of the West Shore Expressway.  The sign was located in Richmond County, Block 2800, part of Lot 32 and measured 14' x 48' (672 square feet).   The contract was administered by the Economic Development Corporation ("EDC").

28.     In 1996, Richmond Outdoor Advertising Company entered a license agreement under which it paid the EDC $1,687 or 25% of gross sales (whichever was greater) per month for the right to operate this sign.  This sign remained standing until approximately March 2002. Through March 2002, the EDC continued to earn income from this Arterial Advertising Sign.

29.     There are two Arterial Advertising Signs on City property in the Bronx at 149th Street and Exterior Street, also administered by the EDC.  The signs are located in Bronx County, Block 2356, Lot 2.  These signs are within 200 feet of and within view of the Major Deegan Expressway.  Each sign is 1200 square feet in area.

30.     From January 1, 2002 through November 30, 2006, Viacom Outdoor, the company that operated this sign, paid the City $8,000 per month to lease the sign.  From December 1, 2006 through December 31, 2007, CBS Outdoor, the company that operated this sign, paid the City $9,162.86 per month to lease the sign.  On March 7, 2008, the Department of Small Business Services (the City agency with jurisdiction over the land where this CBS sign is

situated) served CBS with a 30-day Notice of Termination of License.  That Notice directs CBS to "cease occupying the said premises [i.e. the sign structure located at East 149th Street and Exterior Street at the former Bronx Terminal Market], remove therefrom all advertising displays, and deliver possession thereof to the undersigned [i.e. Department of Small Business Services] no later than April 30, 2008. . . ."

31.    Until approximately March 2000, the New York City Police Department displayed a large sign on the exterior of One Police Plaza, which is a City-owned property, within 200 feet of and within view of the Brooklyn Bridge.  The sign was erected in furtherance of the Police Department's recruitment efforts.  Current Police Department records do not indicate when this sign was first installed.

## V.    Advertising Signs on MTA Property

32.    As stated in documents produced by the MTA and Van Wagner Communications, LLC, there are approximately 28 Arterial Advertising Signs on property owned by the Transit Authority ("NYCTA"), a subsidiary of the MTA, within the City of New York.  Of these signs, two are 20' x 60' (1200 square feet) in size and 16 are 14' x 48' (672 square feet) in size.  A chart listing these signs, their locations and their dimensions is attached hereto as Appendix A, which is expressly incorporated by reference herein.  The chart of billboards on NYCTA properties at Appendix A relies upon information from the MTA's production and Van Wagner Communications LLC's production.  (Van Wagner is the outdoor advertising company licensed to manage advertising signs on NYCTA properties.)

33.    New York State Public Authorities Law Section 1204 lists the powers of the NYCTA.  Subsection 13-a of that section states:  "[n]otwithstanding the provisions of section fourteen hundred twenty-three of the penal law or the provisions of any general, special or local law, code, ordinance, rule or regulation to the contrary the authority may erect signs or other

printed, painted or advertising matter on any property, including elevated structures, leased or operated by it or otherwise under its jurisdiction and control and may rent, lease or otherwise sell the right to do so to any person, private or public."

34.    As stated in by documents produced by the MTA and Titan Outdoor Holdings, Inc., there are approximately 22 Arterial Advertising Signs on the MTA's Long Island Rail Road ("LIRR") properties within the City of New York.  Of these signs, 10 are 20' x 60' (1200 square feet) in size; 9 are 14' x 48' (672 square feet) in size; one is 19'6" x 48' (940 square feet)  in size; one is 20' x 48' (960 square feet) in size; and one is 6' x 80' (480 square feet) in size.  A chart listing these signs, their locations and their dimensions is attached hereto at Appendix A, which is expressly incorporated by reference herein.  The chart of billboards on LIRR properties at Appendix A relies upon information from the MTA's production and Titan Outdoor Holdings, Inc.'s production.   (Titan is the outdoor advertising company licensed to manage advertising signs on the LIRR and Metro North railroad properties.)

35.    According to the RFP issued by the MTA in September 2006 (the "MTA RFP"), the gross revenues for all of the MTA's advertising licenses (NYCTBus, NYCT-Outdoor, L.I. Bus, Metro-North, LIRR & MTA Bus) for 2002-2006 were $58.9 million in 2002; $58 million in 2003; $57.3 million in 2004; $56.9 million in 2005; and $32.9 million in the first six months of 2006.  The MTA attained "billboard revenues" in 2006 of $3.4 million from signs on NYCTA property, $3.5 million from signs on LIRR property and $.5 million from signs on Metro-North property.  None of these figures distinguishes between arterial and non-arterial signs.

36.    As stated in documents produced by the MTA, the MTA has also placed advertisements, known as urban panels, on the tops of approximately 905 subway entrances around New York City.  A list of urban panel locations can be found attached hereto as Appendix B, which is expressly incorporated by reference herein.  Each urban panel measures

approximately 28" x 58" and, except in 92 instances, has advertising copy on both sides, for a total of 1718 faces.

37.     There are 128 urban panels[1] that are on subway entrances on roadways that have been designated by the City as Arterial Highways (primarily the Grand Concourse, Eastern Parkway and Queens Boulevard).   Additionally, there are also 24 urban panels that are on subway entrances on blocks that intersect with Arterial Highways.   Depending upon the placement of the urban panel, it is possible that the advertisement on the urban panel may be seen from the intersecting Arterial Highway.  A chart listing the locations of 128 urban panels on roadways that have been designated by the City as Arterial Highways, photographs of selected urban panels on roadways that have been designated by the City as Arterial Highways, and a chart listing the locations of 24 urban panels on blocks that intersect with arterial highways are attached hereto as Appendix C, which is expressly incorporated by reference herein.  The charts at Exhibit C rely upon information provided by CBS Outdoor, the Transit Authority's licensee, to manage urban panels.

38.     As of April 2008, 80 MTA urban panels display "flat-panel screens," which look like flat-screen televisions and display full-color, full-motion video clips.

39.     The MTA is governed by a 17 member Board.  Four MTA Board members are appointed based upon the recommendation of the Mayor of the City of New York.

40.     The City owns most of the transit facilities used by the NYCTA and its subsidiaries and leases this property (including the rapid transit lines, roads, power substations and distribution facilities, car maintenance and repair shops, bus shops, garages and depots) to

---

[1] For this stipulation and all others herein for which plaintiffs and the City stipulate as to the existence of a certain number of a given type of sign, such stipulations shall not preclude any party from later providing evidence of the existence of additional signs as to whose existence the parties could not at the time of these stipulations reach an agreement.  In addition, such stipulations shall not preclude any party from later providing evidence that they were initially mistaken about the existence of a particular sign.

the NYCTA and its subsidiaries, for the purpose of operating public transportation services in the City.

41.     The City provided operating subsidies to the MTA of $279,059,138 in 2004, $281,782,786 in 2005 and $292,161,582 in 2006 and capital subsidies to the MTA of $80,450,000 in 2004, $104,158,000 in 2005 and $362,216,582 in 2006.

42.     Most of the City's contributions to the MTA are required by the terms of the Lease Agreement between New York City and the NYCTA, New York State law or Memoranda of Understanding between the City and the MTA.

43.     The Lease Agreement between New York City and the NYCTA, dated June 1, 1953, as amended April 19, 1960 and March 6, 1962, as supplemented March 20, 1962, as amended and renewed October 5, 1962, and as amended April 7, 1965 and March 31, 1982, remains in effect.

44.     Other than a July 30, 2003 letter from the New York State Department of Transportation to the MTA, current City employees are  not aware of any efforts by the New York State Department of Transportation to cause the MTA or its subsidiaries to remove or refrain from building Arterial Advertising Signs on MTA property.

45.     The Department of Buildings is the New York City agency charged with the responsibility for enforcing the provisions of the Zoning Resolution related to, *inter alia*, arterial signs.

46.     On March 14, 1980, DOB Deputy Commissioner Irving Minkin issued an internal memorandum stating "Signs on Railroad and Transit Authority property are not within the jurisdiction of the Department of Buildings.  No notice(s) of violation shall be issued with respect to such signs and any outstanding notice shall be promptly cancelled and proof of the cancellation shall be promptly sent to the sign company or its attorney."

47.     On December 28, 1982, New York Attorney General Robert Abrams issued Opinion No. 82-F20, in response to an inquiry from the New York State Department of Transportation regarding "whether the Buildings Department of the City of New York may remove commercial billboards erected in violation of the City's zoning laws on two parcels of property in the City owned by the Metropolitan Transportation Authority ("MTA") and the Consolidated Rail Corporation ("Conrail"), respectively."   The billboards in question were constructed along highways forming a part of the Interstate and Primary Systems as described in the Federal Highway Beautification Act of 1965, 23 U.S.C. § 131.   The Opinion held that the City had jurisdiction to regulate MTA facilities not devoted to transportation purposes, and thus local zoning regulations applied to billboards on MTA property.   Likewise, local regulations applied to Conrail to the extent that they were not inconsistent with or prohibited by applicable federal law.   In sum, the City could require the removal of commercial billboards erected in violation of its zoning law on property owned by the MTA and Conrail.

**VI.     Advertising Signs on Port Authority Property**

48.     There are two Arterial Advertising Signs on a parking garage on property owned by the Port Authority at LaGuardia Airport in Queens, within 200 feet of and within view of Grand Central Parkway.   As stated in a document filed at DOB by JCDecaux, Airport, each of these signs has an area of 1,800 square feet.   The signs were constructed in 2004.   JCDecaux has stated that the signs brought in $1,652,431.84 in revenue to the Port Authority from June 1, 2004 through December 31, 2006, and continue to bring in revenue to the Port Authority.

49.     As stated in documents produced by JCDecaux and the Port Authority, since around June 2006, there has been an Arterial Advertising Sign outside the New York entrance to the Lincoln Tunnel, on property owned by the Port Authority, within 200 feet of and within view of the Manhattan-side Lincoln Tunnel approach.   The dimensions of this sign are 100' x 60', for

a total of 6,000 square feet. From June 1, 2006 through March 31, 2007, the Port Authority received $256,822.01 in fees from this sign.

50.    The City did not ask the Port Authority to remove the Arterial Advertising Signs on Port Authority property (including those at LaGuardia and the Lincoln Tunnel) until September 21, 2006. On that date and on January 18, 2007, Deputy Mayor Daniel Doctoroff sent the Port Authority letters urging the Authority to comply with the provisions of the ZR that are applicable to Arterial Advertising Signs, and Local Laws 14 and 31.

51.    Other than the September 2006 and January 2007 letters, current City employees are not aware of any efforts the City has made at any time since 2004 (the date as of which the three Arterial Advertising Signs listed herein existed on Port Authority property) to convince and/or cause the Port Authority to comply with the arterial advertising regulations in the ZR with respect to these three particular signs.

52.    The Port Authority responded to Deputy Mayor Doctoroff's January 2007 letter on February 6, 2007, with a letter in which it stated that the Port Authority is "not required by law to adhere to these kinds of city regulations," (an assertion which the City currently generally disagrees with) but that as a matter of "policy and practice" it would "work in close partnership with the communities where [it] operate[s] and the governments that serve them." According to that letter, the Port Authority instructed JCDecaux, the company that operates its billboards, to "adhere to all applicable New York City signage rules and regulations." In addition, the Port Authority has withdrawn two prior approvals for JC Decaux to install certain new billboards after receiving the City's request that the Port Authority comply with the City's billboard regulations. The Port Authority has also denied certain other requests by JC Decaux to install new billboards.

53.     Since January 18, 2007, the City has taken no further steps to have the Port Authority comply with the ZR with respect to these three signs.  In his January 18, 2007 letter, Deputy Mayor Doctoroff wrote to the Port Authority as follows: "[a]s the provisions of the Zoning Resolution and local laws related to the placement of outdoor advertising signage in proximity to the City's Arterial Highways and larger public parks are currently stayed until the outcome of pending litigation in federal court, we do not expect the Port Authority to come into immediate compliance with those portions of the City's laws."  As a result, as of the date of this stipulation, all three of the Port Authority Arterial Advertising Signs (two on LaGuardia and one on the Lincoln Tunnel) still stand.

## VII.   Advertising Signs on Amtrak Property

54.     As stated in documents produced by Amtrak, on May 1, 1998, Amtrak entered into a contract with Transportation Displays Incorporated ("TDI") through which Amtrak granted to TDI the right to erect and operate billboards on certain Amtrak property, including property in the City (the "Amtrak Contract").  The initial term of the Amtrak Contract was through February 28, 2006.   CBS Outdoor Group, Inc. ("CBS"), as successor to TDI, subsequently extended the term of the Amtrak Contract several times, through at least December 31, 2006.

55.     There are 17 Arterial Advertising Signs on Amtrak property within the City of New York.  A chart of these Arterial Advertising Signs is annexed as Appendix D, which is expressly incorporated by reference herein.  The information in Appendix D was provided by Amtrak.

56.     As stated by Amtrak, in 2005, Amtrak's income from four of the billboards on its property in the City was $178,635.79 and, in 2006, Amtrak's income from those billboards was $164,082.60.

57.     The Amtrak Contract provides that TDI (and its successor, CBS) are contractually obligated to "comply with all applicable federal, state, and local laws, ordinances, rules and regulations," including both existing and future local laws, ordinances, rules and regulations.

58.     Current City employees are not aware of any efforts that have been made by the City at any time since 1979 to convince and/or cause Amtrak to comply with the arterial advertising regulations in the ZR.

## VIII.   Advertising Signs on United States Property

59.     There is an Arterial Advertising Sign on United States government property at the U.S. Post Office along the West Side Highway.  A CCO employee viewed the sign and estimates, based on his knowledge and experience in the industry, that it measures approximately 50'x35' or 1,750 square feet.

## IX.   Advertising on Street Furniture

60.     The City has in the past entered into franchise agreements with private outdoor advertising companies to furnish, install, maintain and operate bus shelters.  Those franchise agreements permitted the outdoor advertising company to sell advertising space on the bus shelters in accordance with the controls set forth in the franchise agreement.

61.     Under those franchise agreements, the City realized profits of $12,918,902 in 2004, $13,750,000 in 2005 and $13,511,095.89 in 2006 from advertisements on bus shelters.

62.     On May 19, 2006, the City executed a 20-year non-exclusive franchise contract (the "Street Furniture Franchise") with Cemusa, Inc. ("Cemusa") for the installation, operation and maintenance of bus shelters, automatic public toilets, and certain other "public service structures" and for the installation and maintenance of newsstands ("Street Furniture").  Along with Cemusa, plaintiff Clear Channel and three other outdoor advertising companies bid for the Street Furniture Franchise.

63.     Under the Street Furniture Franchise, Cemusa will replace all existing bus shelters with newer designs.  Some of these newly designed bus shelters have already been erected.  By the end of the franchise agreement, Cemusa will have built between 3,100 and 3,500 new bus shelters, the majority of which replace existing bus shelters, and up to 400 of which may be in new locations.

64.     Like the old bus shelters, all of Cemusa's bus shelters may bear advertising.  Like the old bus shelters, the new bus shelters each contain two shelter-end advertising panels positioned perpendicular to the street.  The advertisements on the new bus shelters are larger than on the old bus shelters.  There may be no more than 55 square feet of advertising in total on any new bus shelter.   Old bus shelters were allowed to have no more than 47 square feet of advertising in total.  Thus, the advertising on the new bus shelters may be 8 square feet larger than those on the old bus shelters.

65.     Up to 10% of the new bus shelters may contain additional advertising if the shelter is greater than 25 feet in length.  Such shelters may have an additional 55 square feet of advertising space if the advertising panels are end panels or an additional 27.5 square feet of advertising space if the advertising panels are not end panels.

66.     Like the old bus shelters, the advertisements in the new bus shelters may use back-lighting (except where prohibited by rules or regulations of the Landmarks Commission), and the vast majority of these shelters do in fact use back-lighting.  The advertisement posters are visible day and night.  There is no limit to the level of illumination on the new bus shelters.

67.     The Street Furniture Franchise does not contain any restrictions on the erection of bus shelters within 200 feet of and/or within view of Arterial Highways, or the display of advertising on such shelters.

68.     The Street Furniture Agreement provides for 250 new "scrollers," or signs which rotate through different advertisements on Street Furniture, and permits the use of electronic media on a case-by-case basis.  Eighty of the bus shelters are currently equipped to use scroller advertisements.

69.     Because all potential proposers were told that scrollers were acceptable to the City, the Committee asked Cemusa to clarify whether the value of the scrollers could be included in Cemusa's cash guarantee.  Cemusa clarified that part of the value of its scrollers could be included in the cash guarantee, thus resulting in an increase to Cemusa's GMAC, which was accepted by the City.

70.     In March 2007, the Department of Transportation approved a pilot program permitting some electronic media in bus shelter advertisements.  The program allowed Cemusa to equip 10 bus shelters with both LCD screens and Bluetooth transmitters.   The shelters were located in commercial areas, most with high foot traffic and vehicular traffic.   In March 2008, the City approved the extension of this pilot until June 2008.

71.     An LCD ("liquid crystal display") screen is a flat panel that can display high-resolution full-color video.  LCD technology is used in some flat-screen televisions.

72.     The New York City Department of Transportation did not limit the pilot for LCD screens to one-way streets or to panels facing away from traffic.

73.     Documents produced by Cemusa state that since the inception of the Bluetooth/LCD screen pilot program, Cemusa has installed Bluetooth transmitters in bus shelters for at least five additional advertising campaigns.  In or about March 2007, approximately 40 bus shelters were equipped with Bluetooth as part of an advertising campaign for the Discovery Channel.  At around the same time, Bluetooth was installed in approximately 32 shelters for a Nokia advertising campaign.   In or about February 2008, Bluetooth was installed in

18

approximately 28 shelters for a Ford ad campaign. In or about February 2007, Bluetooth was installed in approximately 80 shelters for a Pepsi advertising campaign. In or about June 2007, Bluetooth was installed in approximately 15 shelters for a Citibank advertising campaign.

74.     The City did not authorize any advertising campaigns featuring Bluetooth transmitters other than the initial pilot program. As DOT does not monitor the content of advertising at the approximately 3100 bus stop shelters throughout the City (except for acting on complaints regarding advertising prohibited by the Franchise Agreement), it did not make visual inspections to ensure that Cemusa had only installed Bluetooth in only ten bus shelters. Rather, the City monitored by asking its franchisee to confirm that they complied with the terms of the pilot program. The City did not become aware of or seek to prevent the additional advertising campaigns until March 2008, when it was alerted to the existence of unapproved Bluetooth locations through discovery in this litigation, at which time it required Cemusa to cease and desist in its use of Bluetooth at any and all sites not approved in the initial pilot program.

75.     Pursuant to the agreement between the City and Cemusa governing the Bluetooth/LCD screen pilot program, the Bluetooth cast radius at the enabled bus shelters is only permitted to be fifteen feet. However, according to Cemusa, the technology it installed has the capacity to transmit content in a radius of up to 20 feet.

76.     If their telephones or other handheld devices are turned on, pedestrians and drivers with Bluetooth-enabled phones or other handheld devices who pass within the cast radius of the bus shelters with Bluetooth transmitters can receive an audible ping or vibration alerting them that they have received an advertising message sent to their phone or other device.

77.     According to material from Qwikker, the company that supplied Cemusa with its Bluetooth services, the Bluetooth transmitters installed in New York City bus shelters have the

capacity to transmit images, wallpaper, coupons, video files (such as television or movie trailers), audio files (such as ringtones), games and applications.

78.     In December 2007, Cemusa reported to the City that the LCD/Bluetooth pilot program increased advertising revenue by over 50% for each test shelter.

79.     The City has also approved another pilot program wherein 20 bus shelters have mini-panel LCD "tickers" that display stock quotes, the time and temperature.

80.     As of approximately March 2007, there were approximately 3,106 bus shelters on City property.  Most bus shelter advertisements are visible from the street.  Each bus stop shelter is at a location where an MTA bus makes a stop along its route.

81.     Of the 3,106 bus shelters on City property as of approximately March 2007, approximately 199 of them are on roads that have been designated by the City as Arterial Highways.  A list of the locations of bus shelters on roads that have been designated by the City as Arterial Highways, as well as a selection of photographs of these bus shelters, are attached hereto as Appendix E, which is expressly incorporated by reference herein.

82.     Additionally, there are also 122 bus shelters on blocks that intersect with Arterial Highways.  A list of these 122 bus shelters is also included in Appendix E.  Depending upon the placement of the bus shelter, it is possible that the advertisement on the shelter may be seen from the intersecting Arterial Highway.

83.     Under the new Street Furniture Franchise, replacement franchise newsstands will for the first time have advertising.  Cemusa will replace at least 284 existing newsstands and may eventually install more than 330 newsstands  located throughout the City.  Each newsstand may contain up to 82.5 square feet of advertising.  The newsstands have advertising panels of varying sizes depending on the dimensions of the newsstand.  In general there is one smaller advertising

panel on the side of the newsstand and one larger back advertising panel that usually faces the street depending on the orientation of the newsstand on the sidewalk.

84.    Prior to the current Street Furniture Franchise, City regulations expressly prohibited any advertising on the outside of newsstands.  Accordingly, in order to permit the City to enter into the Coordinated Street Furniture Franchise, in 2004 the City amended its Administrative Code to, *inter alia*, allow advertising on the exterior of newsstands.

85.    The City is generally entitled to receive at least 50% of the gross revenue derived from the Street Furniture Franchise, including ad revenues.

86.    The City is entitled to receive a Guaranteed Minimum Annual Compensation (GMAC) totaling approximately $999 million over the twenty-year contract term.

87.    The GMAC and other consideration amount to over $1 billion owed to the City over the 20-year term of the Street Furniture Franchise.

88.    By December 2007, the City had already received $118.5 million under the Street Furniture Franchise.  Pursuant to the terms of the Street Furniture Franchise Agreement, this amount represents Cemusa's pre-payment to the City of the first four years of cash compensation.

89.    Cemusa must provide 2.5% of advertising space on all street furniture to the City to use for public service messages.  Cemusa must further provide 20% of advertising space on all street furniture to New York City Marketing to use for commercial advertising, advertising promoting New York City and additional public service advertising.

90.    Cemusa must also provide the City with "in-kind" payments in the form of posting advertisements for the City of New York on Cemusa-owned out-of-home advertising media (including billboards) in other cities throughout the world.  The guaranteed minimum

value of such in-kind advertising over the course of the Street Furniture Franchise is $398,400,000.

91.     In evaluating the bidders for the Street Furniture Franchise, the City weighed a variety of factors.. Of the factors considered, "Assessment of Compensation Package," which included a review of the compensation proposals submitted by each proposer, comprised approximately 38% of the total score for the RFP evaluation.  Additionally, "Assessment of Proposer's Ability to Provide Required Services," consisted of a review of each proposer's business organization, financial fitness and experience with street furniture and the sale and maintenance of outdoor advertising in urban environments, and comprised approximately 17% of the total score for the RPF evaluation.   "Assessment of Technical Proposals," which included a review of the design, manufacture, installation and operation of the street furniture, comprised 41% of the total score for the RFP evaluation.

92.     In order for the City to issue an RFP for a street furniture franchise, the proposed franchise must undergo review pursuant to the Uniform Land Use Review Procedure ("ULURP"), the New York State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review procedures ("CEQR").   In issuing the 2004 RFP for the Coordinated Street Furniture Franchise, the City relied upon a ULURP review of a prior street furniture proposal made in 1996.   In 1996, the initial RFP as proposed by the New York City Department of Transportation was opposed by the Manhattan Borough President and the Manhattan Borough Board.  Nineteen of 41 community boards recommended against the RFP proposed by the DOT, with the remaining community boards largely in favor of the franchise only with modifications and with one more abstaining.  In October, 1996, the City Planning Commission approved the application for a street furniture franchise with modifications to that which had been proposed by DOT, including the recommendation that the advertisements on bus

shelters be limited to 55 square feet and the advertisements on newsstands and public toilets be limited to 70 square feet. In December 1996, after evaluating the land-use impacts of the proposed franchise, the City Council approved the then-proposed street furniture franchise and raised the maximum square footage of the advertisements on newsstands and public toilets to 82.5 square feet. In 2003, the Department of City Planning determined that a new ULURP review for the Coordinated Street Furniture Franchise did not need to be performed and that the City could rely upon the prior review, stating that the re-proposed CSFF did not present any new land use impacts or implications which would require a new ULURP review.

93.     The CSFF went through the ULURP, SEQRA and CEQR process. The City has not conducted or commissioned any studies, and it is not aware of any studies, concerning the impact on traffic safety or aesthetics of advertising on street furniture.

94.     As part of the LED/Bluetooth pilot program, the City is currently looking at traffic data for the areas in which the pilot is located.

## X.    Advertising on Phone Kiosks

95.     In 1999, the City offered franchises to install, operate and maintain public pay telephones ("PPTs") on, over and under the City's streets in order to provide public pay telephone services. These franchises have a term of 11 years with a 4-year renewal option.

96.     The PPT franchise agreement permits the placement of advertising panels on the exterior rear and side panels of the enclosure for curb-line PPTs in commercial and/or manufacturing zoning districts and any other zoning districts where commercial and/or manufacturing uses are permitted as of right.

97.     The PPT franchise agreement further requires franchisees to use qualified media representatives to represent, organize and manage the advertising space on public pay telephones.

98.     There are several authorized enclosures for PPTs, some of which are permitted to contain advertising, including double-sized kiosks which contain two phones.   Advertising on side display panels will only be permitted if such panels are no greater in size than 27" x 57". Advertising on rear display panels on double-sized kiosks may be no larger than 57" x 27" for horizontal ads and  54" x 57" for vertical ads.

99.     The franchise agreements allow the ads placed on PPTs to be illuminated, so long as illumination does not violate other City rules, such as the rules of the Landmarks Preservation Commission which do not allow illumination in Historic Districts.

100.     After the PPT franchises took effect in 1999, there was rapid growth of curb-line PPTs with advertisements in Central Manhattan.  According to a DOITT report, from 1999-2004, "[a] heavy burden of additional visual clutter from PPT advertising [fell] on C[ommunity] D[istrict]s 1-8 [Manhattan below 110th Street on the West Side and below 96th Street on the East Side], both in terms of total numbers [of PPTs] and in terms of new installations since 1999." Further, according to DOITT,  "the weight of such burden is even more profound given that this visual clutter has been concentrated within a much smaller physical area than it would in other community districts.  Although the eight community districts that comprise CDs 1-8 represent *8/59,* or about 14%, of the total number of 59 community districts in the City, these eight districts actually represent only about 4% of the geographic area of the City..... About 72% of the PPT advertising panels on the City's streets have been squeezed into about 4% of the City's area."  These new phone kiosks were placed on City streets without regard for what locations actually needed greater phone service.

101.     On October 5, 2004, Section 6-06(c) of title 67 of the RCNY was amended to prohibit the placement of new advertisements on new PPTs installed pursuant to approvals

issued after December 4, 2004 in Manhattan Community Districts 1-8.  Some Arterial Highways run through these Community Districts.

102.    DOITT has approved the use of LED technology on PPT ads for New York Lotto.

103.    The City collects 26% of net advertising revenues generated by ads placed on PPTs.

104.    The City derived financial gains of $10,728,963.52 in 2004, $12,459,593.70 in 2005, $14,103,080.14 in 2006 and $14,017,347.61 in 2007 from advertisements on public pay telephones.

105.    Approximately 75% of the revenue generated by DOITT through PPTs comes from advertising revenue, and 25% of the revenue comes from non-advertising revenue such as fees for permits and telephone usage.

106.    There are 104 phone kiosks bearing advertisements on roads that have been designated by the City as Arterial Highways (*e.g.*, West Street, Grand Concourse, Queens Boulevard, Cross Bay Boulevard, Horace Harding Expressway) and 59 phone kiosks bearing advertisements on roads that may potentially qualify as bridge and tunnel approaches.  There are also 28 additional phone kiosks bearing advertisements situated on streets that intersect with roadways that have been designated by the City as Arterial Highways.  If the phones on these streets are situated at the intersection with the Arterial Highway, it is likely that the advertisements on these phone kiosks can be viewed from the Arterial Highway.  A list of these phone kiosks is attached hereto as Appendix F, which is expressly incorporated by reference herein. Each phone kiosk contains two or three advertisement panels.

107.    Approximately 59% of the PPTs in the City are located along the curbline of the sidewalk adjacent to the street.  The remaining 41% are located along the building line.

108.    The City has not conducted or commissioned any studies concerning the impact on traffic safety or aesthetics of advertising on public pay telephones.

## XI.    Advertising on City-Licensed Vehicles

109.    The New York City Taxi and Limousine Commission ("TLC") issues permits for advertising on the rooftops of taxicabs.  No other advertising is permitted on taxicabs or other TLC-licensed vehicles.  In 1996, TLC permitted a brief pilot project whereby a limited number of taxicabs were allowed to have ads in the form of a see-through film on their rear windows.  Upon conclusion of the pilot project, TLC announced that the rear window ads would not be allowed thereafter.

110.    There are over 13,000 licensed medallion taxicabs in the City of  New York.  Presently, TLC has issued approximately 7300 permits for advertising on the rooftops of taxicabs.       Many of the cab-top advertising boxes are permitted to include digital advertisements.

## XII.   Lamppost Banners

111.    Pursuant to the regulations set forth in Title 34, Section 2-14(b), the Commissioner of the New York City Department of Transportation may issue permits for the display of banners on lampposts promoting cultural exhibits and events or public or historical events which foster tourism and/or enhance the image of the City.  As set forth in subsection (b)(2)(v), although banners may not contain advertising, the trade names(s) or logo(s) of the sponsor(s) of the event may be placed on the banner but shall occupy no more than 10% of the banner in total.  The Corporate Sponsor's trade name or logo is to be located in the lower portion of the banner.

112.   As set forth in 34 RCNY 2-14(b)(2)(iii), horizontal banners are not permitted.  As explained in subsection (b)(2)(iv), vertical banners may not be more than 3 feet wide and not more than 8 feet in height (*i.e.*, a maximum of 24 square feet).

113.   Such banners are permitted to be hung directly over the street.

114.   The City has permitted thousands of these banners to be placed on its lampposts.

115.   Of these banners, at least 250 have been placed on roadways that have been designated by the City as Arterial Highways (in all five boroughs).  A chart listing the locations of 250 lamppost banners on roadways that have been designated by the City as Arterial Highways is attached hereto as Appendix G, which is expressly incorporated by reference herein.

116.   The City has never conducted or commissioned any studies concerning the impact of lamppost banners on traffic safety or aesthetics.

## XIII.   Advertising by the City on Private Property

117.   The International Olympic Committee required every bidding city to be able to ensure that every outdoor advertising sign in the city during the time of the Olympics (and for a period before and a small period after) would be available for Olympic sponsors.  As a result, in preparing for a bid to host the 2012 summer Olympic and Para-Olympic Games, a non-profit organization working with the City on the bid negotiated with major outdoor advertising companies to obtain an option to use outdoor advertising signs existing in 2012 for a seven week period before and during the Olympics.

118.   The option contract required the outdoor advertising companies to grant an option to the non-profit "NYC 2012," which could be assigned to the New York Committee for the Olympic Games, to use all outdoor advertising signs existing at the time of the Olympics, including those on Arterial Highways, at a negotiated rate.   The International Olympic

Committee did not require bidding cities to cease enforcement efforts which could result in the removal of signs prior to the start of the Olympics.

119.   New York City and its various agencies have placed commercial and non-commercial copy on billboards and other types of signs around the City.   Some copy has appeared on Arterial Signs.

120.   From 2004 through 2006, the NYPD ran nine campaigns (recruitment and other non-commercial campaigns) involving the use of outdoor signage.   Each campaign ran for stints of approximately two months and utilized approximately 400 312-square foot signs throughout the City. Of the signs used for the NYPD campaigns, 29 signs were on roadways that have been designated by the City as Arterial Highways.

121.   From 2005 through 2007, the Department of Corrections ("DOC") ran five recruitment campaigns involving the use of outdoor signage.   Each campaign ran for stints of approximately two months and utilized, respectively, approximately 350, 200, 200, 200 and 100 55-square foot  signs throughout the City.  Of the signs used for the DOC campaigns, 15 were placed on roadways that have been designated by the City as Arterial Highways.

122.   From 2005 through 2007, the Parks Department ran seven campaigns (such as lifeguard recruitment and the Central Park winter festival) involving the use of outdoor signage. These campaigns typically ran for stints of approximately one month, with one campaign lasting three months and one lasting seven months.  The campaigns typically utilized approximately 80 bus stop shelters, but one campaign used 100 shelters and one used 40 shelters.  Of the bus shelters used for the Parks Department campaigns approximately 9 shelters may have been on roadways that have been designated by the City as Arterial Highways.

123.   NYC Marketing has regularly placed both public service announcements and advertisements  for  private  companies  doing  business  with  the  City  on  bus  stop  shelters

throughout New York City. NYC Marketing has also placed public service announcements on phone kiosks throughout New York City. "As a regular course, NYC Marketing would provide Viacom or Cemusa with public service announcements/advertisements and request that they post them. Viacom and Cemusa in turn would determine where to place the public service announcements/advertisements and thereafter rotate them on a monthly basis." There are approximately 15 bus shelter locations in the Bronx alone that are on roadways that have been designated by the City as Arterial Highways "on which Cemusa rotates public service announcements/advertisements from New York City Marketing." Additionally, there are approximately 4 such bus shelters in the Bronx alone on blocks that intersect with Arterial Highways. Depending on the placement of the bus shelter, it is possible that the advertisement on the shelter may be seen from the intersecting Arterial Highway.

124.    New York City Marketing has also placed "Made in New York" advertisements on 29 different bus shelters in the Bronx and Queens on roadways that have been designated by the City as Arterial Highways. Through agreements with Snapple and The History Channel, NYC Marketing placed a variety of bus shelter advertisements for these two companies around New York City. In addition, NYC Marketing placed announcements for City events sponsored by Snapple and the History Channel on street banners and phone kiosks.

125.    From 1997 through 1998 the Department of Sanitation ran several non-commercial campaigns (such as the Stomp Out Litter Campaign) during which, DOS used approximately 30 bus shelters throughout the City on roadways that have been designated by the City as Arterial Highways.

126.    For one month in 2004, the Office of Emergency Management ("OEM") placed non-commercial messages on two billboards within 200 feet of and within view of Arterial Highways. For two months in 2006, OEM placed non-commercial messages on three billboards

within 200 feet of and within view of Arterial Highways.  The OEM also placed non-commercial messages on four bus shelters throughout the City that may have been on roadways that have been designated by the City as Arterial Highways.  The Department of Consumer Affairs ("DCA") placed a non-commercial announcement on the Yankee Stadium Billboard within 200 feet of and within view of the Major Deegan Expressway, an Arterial Highway, for one month in 2006 and one month in 2007.  The DCA also placed non-commercial messages on four bus shelters throughout the City on roadways that have been designated by the City as within 200 feet of and within view of Arterial Highways in 2007.

127.    The FDNY has placed free messages  on Van Wagner phone kiosks, CBS bus shelters, and Cemusa bus shelters for the EMS campaign and other non-commercial campaigns. These campaigns included the use of 45 bus shelters, of which seven were on roadways that have been designated by the City as Arterial Highways, which were posted for between four and eight weeks each, providing the FDNY with free services worth $74,250.  Additionally, during these campaigns, the FDNY posted non-commercial advertisements on 15 phone kiosks located on roadways that may have been designated by the City as Arterial Highways.

128.    In order to encourage production in New York City, the Mayor's Office of Film, Theatre and Broadcasting gives marketing credits to productions filmed in the City in the value of 1% of the total production cost.  Marketing credits include, but are not limited to, outdoor advertising .  Under the "Made in New York" program, such productions are given free advertising space at various locations including bus shelters and media screens at Times Square and Port Authority.

## XIV.    The Fresh Direct Sign

129.    The City granted an accessory permit to a sign advertising Fresh Direct, the internet-based grocery delivery service, for a large digital billboard which is located at 2330

Borden Ave., Queens, within 900 feet of and within view of the Long Island Expressway (the "Fresh Direct Sign"), in 2000, prior to the 2001 zoning amendments which limit the size and height of accessory signage. The Fresh Direct Sign typically advertises both Fresh Direct's services and products sold through Fresh Direct, such as soy milk and baby food. A DOB enforcement proceeding resulted in a decision issued on May 30, 2002 by Administrative Law Judge Catherine Tinker, (i) holding that the Fresh Direct Sign remained an accessory use sign despite the appearance of advertisements for products sold by Fresh Direct, and (ii) dismissing the DOB's Notices of Violation. The City did not appeal the decision, nor issue any future violations against the Fresh Direct Sign.

130.   It is the City's position that the Fresh Direct sign qualifies as an accessory sign because the business on the zoning lot is "prominently featured" on the sign, *i.e.*, 51% of the copy "directs attention to the business on the zoning lot," and the remaining 49% of the copy only features those products offered or sold at the business on the zoning lot.

## XV.   PLAINTIFF CLEAR CHANNEL'S BILLBOARDS

131.   Plaintiff Clear Channel Outdoor, Inc. ("Clear Channel"), then operating under the name Eller Media Company, entered the New York City market when its parent company, Clear Channel Communications, Inc., acquired the stock of Universal Outdoor Holdings, Inc. ("Universal") in April 1998. Clear Channel acquired approximately 34,000 outdoor advertising signs in 23 geographically diverse markets from Universal, including approximately 70 arterial sign faces in New York City. Clear Channel paid $1.7 billion for the nationwide acquisition, of which the approximate allocation for New York City is at least one hundred million dollars.

132.   Between 2000 and 2005 Clear Channel acquired additional arterial sign faces from a series of smaller acquisitions of outdoor advertising companies, leases and sub-leases. Clear Channel presently operates 84 arterial sign faces in New York City. Of those, one is

11,258 square feet; one is 1728 square feet; one is 1600 square feet; one is 1492 square feet; one is 1248 square feet; 38 are 1200 square feet; 29 are 960 square feet; one is 940 square feet; nine are 672 square feet; one is 576 square feet; and one is 315 square feet.  These sign faces are all illuminated and are either affixed to buildings (walls or roofs) or pylons.

133.   The vast majority of arterial sign faces in Clear Channel's current inventory do not have permits to display advertising copy.  Rather, Clear Channel's predecessors obtained Accessory Use permits for the vast majority of arterial sign faces in Clear Channels' current inventory and used them as advertising signs prior to Clear Channel's acquisition of those predecessors.

134.   Clear Channel believes that of its 84 arterial sign faces, at least 19 should qualify for legal non-conforming use status.  Legal non-conforming use status permits advertising copy to be legally displayed on arterial signs.

135.   None of Clear Channel's arterial sign faces displayed accessory copy in 2005 or 2006 and none of Clear Channel's arterial sign faces display accessory copy in April 2008.

136.   In 2005, eight of Clear Channel's arterial sign faces displayed non-commercial copy.  Of those, three signs displayed non-commercial copy for the entire year, one sign displayed non-commercial copy for nine and a half months, two signs displayed non-commercial copy for three months, and three signs displayed non-commercial copy for two months.  During the months these signs did not display non-commercial copy they displayed commercial advertising.

137.   Clear Channel's 76 other arterial sign faces displayed advertising copy for all of 2005.

138.   In 2006, thirteen of Clear Channel's arterial sign faces displayed non-commercial copy.  Of those, three signs displayed non-commercial copy for the entire year, one sign

displayed non-commercial copy for eleven months, one sign displayed non-commercial copy for five months, three signs displayed non-commercial copy for three months, four signs displayed non-commercial copy for two months and one sign displayed non-commercial copy for one month.    During the months these signs did not display non-commercial copy they displayed commercial advertising.

139.    Clear Channel's 71 other arterial sign faces displayed advertising copy for all of 2006.

140.    Clear Channel derives approximately ten million dollars in revenue each year from its New York City arterial sign faces.

141.    The City's zoning laws and related local laws permit outdoor advertising companies to lawfully maintain outdoor advertising signs in some commercial and manufacturing zoning districts of the City other than in proximity to Arterial Highways in accordance with certain size and placement restrictions set forth in the City's zoning and local laws.

142.    Clear Channel Outdoor controls at least one hundred outdoor advertising signs in New York City that are not in proximity to the Arterial Highways.

143.    When Clear Channel acquired its New York City arterial sign faces, Clear Channel also acquired the files and records regarding the sign faces that had been maintained by the prior owners, in the condition and to the extent that they existed at that time.  For the most part, the existing files and records are presently located in Clear Channel's New York City office.  Clear Channel's files are typically organized by property owner and Clear Channel employees in the New York City office know the property owners and where the signs associated with those owners are located.

144.   The Department of Buildings has lost many documents, including copies of sign permits, from its sign files, due in part to property owners requesting files from DOB and not returning them.

145.   Because of the massive scale and diverse array of regulatory contexts, in most instances, in acquiring arterial sign structures from Universal and other outdoor advertising companies, Clear Channel did not perform due diligence on a sign-by-sign basis in order to determine whether each sign had been issued the required permits and/or complied with provisions of local law.  Clear Channel relied primarily upon representations from the sellers and on the presence of such signage in open view.  For example, Universal represented and warranted that it had not conducted its business "in violation of any law, ordinance or regulation of any governmental body or authority," except for violations which either were publicly reported in certain SEC reports or which had no "Material Adverse Effect" on Universal. Universal reported no violations in the New York market either in the acquisition documents or the specified SEC reports.

## XVI.   ATLANTIC PLAINTIFFS' BILLBOARDS

146.   Plaintiff Atlantic Outdoor Advertising, Inc. ("Atlantic") entered the New York City outdoor advertising market in 1997.  Atlantic presently operates three illuminated arterial signs (structures and faces) in New York City.  Atlantic contracted to build two of the sign structures and acquired the third by entering into a lease with the property owner.  One sign structure was acquired in 1998, one was acquired in 1999 and one was acquired in 2000. Atlantic spent a significant amount of money in acquiring these signs.  One sign structure is a rooftop display with a 1200 square foot face; one sign structure is a single-pole ground structure with a 1200 square foot face; and one sign structure is a rooftop display with a 1950 square foot face.

147.   Plaintiff Scenic Outdoor Inc. ("Scenic") also entered the New York City outdoor advertising market in 1997.  Scenic presently operates five illuminated arterial signs (three structures with a total of five faces) in New York City.  Scenic contracted to build two of the sign structures and purchased the third from its previous owner.  Two sign structures were acquired in 1999 and one sign structure was acquired in 2000.  Scenic spent a significant amount of money in acquiring these signs.  Two sign structures are double-pole ground structures with two 1200 square foot sign faces and one sign structure is a rooftop display with a 672 square foot face.

148.   Plaintiff Troystar Corporation ("Troystar") first engaged in the outdoor advertising business in New York City in 1995.   Troystar presently operates nine illuminated arterial signs (eight structures with a total of nine faces) in New York City.  Troystar contracted to build two of the sign structures (which are a combination of roof and wall structures) and the others were acquired by entering into leases with the property owners.  Two sign structures were acquired in 1998, four structures (of which one has two faces) were acquired in 2004 and two were acquired in 2006.  Troystar spent a significant amount of money in acquiring these signs. One sign face is 5760 square feet; one is 2640 square feet; one is 2320 square feet; two are 1200 square feet; two are 960 square feet; one is 840 square feet; and one is 420 square feet.

149.   Plaintiff Willow Media, LLC ("Willow") first engaged in the outdoor advertising business in New York City in or about 1999.  Willow presently operates seven illuminated arterial signs (four structures with a total of seven faces) in New York City, which it contracted to build in 1999.  Willow spent a significant amount of money in building these signs. The sign faces are all on ground structures and, with one exception, are all 1200 square feet.  One sign face is 960 square feet.

150.   In most instances, at the time they built or acquired their arterial signs, Atlantic, Scenic, Troystar and Willow did not assess whether the signs complied with the Zoning

35

Resolution and Administrative Code. Instead, these companies relied upon their perception of the Department of Buildings' enforcement practices.

151.   The Atlantic, Scenic, Troystar and Willow arterial signs all display advertising copy. For the most part, the Atlantic, Scenic, Troystar and Willow arterial signs do not have permits to display advertising copy. Rather, these companies generally obtained Accessory Use permits for their arterial sign faces. With respect to Willow, for example, with the possible exception of the first few months after its signs were built or acquired, none of its arterial sign faces have ever displayed accessory copy. During the times Willow's signs displayed accessory copy, they did not generate any revenue for Willow.

152.   The gross revenue that is generated by any given Arterial Advertising Sign varies widely depending upon a variety of factors, including its location. Generally, the Atlantic, Scenic, Troystar and Willow arterial signs tend to generate between approximately $5,000 and approximately $30,000 per month in gross revenues during the months in which they display advertising copy.

153.   Generally, Atlantic, Scenic, Troystar and Willow have rarely sold space on their Arterial Advertising Signs for non-commercial purposes other than for a nominal fee. Recently, however, Scenic sold space on one of its Arterial Advertising Signs for non-commercial purposes for its full rate. Other than that, none of the Atlantic, Scenic, Troystar and Willow arterial signs presently display non-commercial copy.

154.   The City's zoning laws and related local laws permit outdoor advertising companies to lawfully maintain outdoor advertising in some commercial and manufacturing zoning districts of the City other than in proximity to Arterial Highways in accordance with certain size and placement restrictions set forth in the City's zoning and local laws.

IN WITNESS WHEREOF, the parties hereto, by their counsel, have executed these Stipulations on the date(s) written beside their names, respectively.


AS TO PARAGRAPHS 1-145:

Dated: New York, New York          DAVIS WRIGHT TREMAINE LLP
      May 12, 2008              By:_____
                                  Victor A. Kovner (VK 2248)
                                  Linda Steinman (LS 5906)
                                  Sharon L. Schneier (SLS 1151)
                                  James Rosenfeld (JR 2256)
                                  1633 Broadway
                                  New York, New York 10019-6708
                                  Phone (212) 489-8230
                                  Fax (212) 489-8340

                                  *Attorneys for Plaintiff Clear Channel Outdoor, Inc.*


AS TO PARAGRAPHS 1-130;

146-154:


Dated: New York, New York          EMERY CELLI BRINCKERHOFF & ABADY LLP
      May 12, 2008
                    By:_____
                                  Richard D. Emery (RE 5181)
                                  Eric Hecker (EH 0989)

                                  75 Rockefeller Plaza, 20th Floor
                                  New York, N.Y. 10019
                                  (212) 763-5000

                                  *Attorneys for Plaintiffs Atlantic Outdoor Advertising, Inc., Scenic Outdoor, Inc., Troystar Corporation, and Willow Media, L.L.C.*

AS TO ALL PARAGRAPHS:

Dated:  New York, New York       OFFICE OF CORPORATION COUNSEL OF THE
        May 12, 2008             CITY OF NEW YORK

                                 By: _____
                                     Sheryl R. Neufeld (SK 2728)
                                     Assistant Corporation Counsel

                                     100 Church Street, Room 5-199
                                     New York, NY 10007
                                     (212) 788-1035

                                     *Attorneys for Defendants*

38